MINERVA GORDON & others *vs.* HAROLD B. GORDON & others.

Bristol. October 25, 1954. — February 7, 1955.

Present: QUA, C.J., LUMMUS, WILKINS, SPALDING, & WILLIAMS, JJ.

*Devise and Legacy,* Condition against marriage with one "not born in the Hebrew faith," Validity. *Restraint on Marriage. Constitutional Law,* Religion, Due process of law, Equal protection of laws, Privileges or immunities of citizens. *Words,* "Born," "Hebrew faith," "Revoke."

A provision in a will revoking gifts made thereunder to a son of the testator if he should "marry a person not born in the Hebrew faith" must be applied in the light of the facts existent at the time of a marriage by him, and a finding that at a time when he married in a civil

ceremony a woman who had been raised in the Roman Catholic faith of her parents she "was not in any sense . . . Hebrew and it could not then be said that she was born in the Hebrew faith" could not be pronounced plainly wrong, although she had been receiving religious instruction from rabbis for two years before such marriage and seven months after it, just previous to going through a rabbinical ceremony of marriage with him, became a convert to Judaism and received a certificate recognizing her conversion.   [200–201]

It was correctly ruled that the word "born" in the phrase "not born in the Hebrew faith" was used in a will in its ordinary meaning of physical birth and not in an abstruse theological sense.   [201]

A provision in a will revoking gifts made thereunder to any child of the testator if he "shall marry a person not born in the Hebrew faith" was not too uncertain to be enforced.   [201–205]

A provision in a will that if any of the children of the testator "shall marry a person not born in the Hebrew faith, then I hereby revoke the gift or gifts and the provision or provisions herein made to or for such child" was not intended to be confined to marriages contracted in the testator's lifetime but applied to marriages contracted by his children after his death; and such provision was not invalid as an unreasonable restraint on marriage.   [205–208]

A decree of a Probate Court enforcing a provision in a will whereby the testator revoked gifts or provisions made thereunder to or for any child of his who should "marry a person not born in the Hebrew faith" did not violate the guaranties of religious freedom in contravention of the First and Fourteenth Amendments to the Constitution of the United States and arts. 1 and 2 of the Declaration of Rights of the Constitution of Massachusetts, nor violate the clauses of the Fourteenth Amendment dealing with the privileges and immunities of citizens, due process of law, and equal protection of the laws.   [208]

An appeal by petitioners in a proceeding in a Probate Court was dismissed where it was from a decree in accordance with the petitioners' own unamended prayer and constituted an attempt to raise in this court an issue not raised in the Probate Court.   [208–209]

PETITION, filed in the Probate Court for the county of Bristol on August 8, 1952.

The case was heard by *Fuller*, J.

*Samuel E. Angoff*, (*Robert D. Manning* with him,) for the respondent Sarah G. Lewitsky.

*Stuart Macmillan*, (*Lewis L. Wadsworth, Jr.*, & *Beatrice H. Mullaney* with him,) for the respondent Harold B. Gordon.

*Lee M. Friedman*, for the petitioners.

WILKINS, J.   Joseph Gordon of Attleboro died in 1943, survived by a widow, who has since died, and five daughters

and a son.  This petition by four daughters seeks a binding determination as to whether the son Harold, a respondent, has lost rights under the will by reason of paragraph 14 thereof, which provides: "If any of my said children shall marry a person not born in the Hebrew faith, then I hereby revoke the gift or gifts and the provision or provisions herein made to or for such child, and I direct that the portion or portions of my estate, and the interest or interests therein which I have by this will given to such child so marrying a person not born in the Hebrew faith shall be paid and made over to that person or persons who would have been entitled thereto under this will if such beneficiary had died before becoming entitled by the provisions hereof to such portion or portions, interest or interests, without leaving lawful issue."  Other respondents include the fifth daughter, Sarah Lewitsky, and the executors under the will of Joseph Gordon.

After hearing, a decree was entered providing "that all rights of the respondent Harold B. Gordon as beneficiary under Article Ninth of said will to distributions of income and principal after May 11, 1949, when he married a person not born in the Hebrew faith, are revoked as of that date, and that all rights to distributions of income and principal after that date which would otherwise have been payable to said Harold B. Gordon are vested in equal shares in the petitioners Minerva Gordon, May C. Pite, Lillian G. Silverman and Sadye G. Freedman, and the respondent Sarah G. Lewitsky, payable to them or their issue in accordance with paragraph 3 of Article Ninth of said will."  Harold appealed.  The petitioners also appealed from the decree "so far as it relates to Sarah G. Lewitsky."

The judge made a report of these material facts found by him.  On May 11, 1949, Harold married Veronica Albaugh in a civil ceremony in Elkton, Maryland.  Veronica was not a person born in the Hebrew faith.  Her parents were Roman Catholic, and she was raised in that faith.  She lived in Berlin, New Hampshire, and practised there in accordance with the tenets of that faith until in 1944 at the

age of 28 she went into the army. Veronica and Harold had been acquainted since 1938. She learned of the provisions of the will two or three months after the testator's death. Beginning in 1947 she undertook religious instruction under rabbis. On December 27, 1949, she became a convert to Judaism and received a certificate recognizing her conversion. Later on the same day Harold and she went through a rabbinical ceremony of marriage. She was then pregnant with a child born on February 9, 1950.

Joseph Gordon was an orthodox Jew, and his children were brought up in the tenets of that faith. About 50 Jewish families lived in the city of Attleboro and the town of North Attleborough. There was an orthodox synagogue in Attleboro. Harold was not limited in the choice of a wife to a resident of that city. "I find both in fact and in law that the provisions of the Fourteenth Article of the will did not operate as an unlawful restraint on marriage." From the religious point of view of the orthodox Jew, a person who is converted to Judaism becomes, with minor exceptions, as though born a Jew. This concept, however, is not accepted by all Jews. Some hold that the conversion has no retroactive effect. On May 11, 1949, when the marriage took place, Veronica "was not in any sense Jewish or Hebrew and it could not then be said that she was born in the Hebrew faith." Her conversion did not occur until more than seven months later.

"There was much testimony as to the variety of meanings and lack of meaning, from an ecclesiastical point of view and otherwise, of the words 'born in the Hebrew faith' singly and collectively. The word 'Hebrew' and the word 'Jewish' are interchangeable in usage. I find no such uncertainty in the meaning of these words as to make their application to the facts in this case too difficult."

1. The respondents contend that the judge was plainly wrong in finding that at the time of her marriage on May 11, 1949, Veronica "was not in any sense Jewish or Hebrew and it could not then be said that she was born in the Hebrew faith." It is argued also that the statement is

inconsistent with the finding that from the religious viewpoint of the orthodox Jew a convert becomes, with minor exceptions, as though born a Jew. The findings, however, were focused upon the date of the marriage, at which time, if at all, the provisions of paragraph 14 must be capable of being understood and applied. The arguments of the respondents would equally embrace a conversion fifty years after the marriage. Should it be necessary to wait the entire lifetime of a spouse to see if he or she might become a convert to Judaism, the purpose of the provision would be nullified. See *Denfield, petitioner,* 156 Mass. 265, 269. Regardless of the dogmatic dispute as to the retroactive effect of conversion, we think that the provision as to marriage with "a person not born in the Hebrew faith" must be judged in this case on the facts as they stood on May 11, 1949. The only certain thing then was that Veronica since 1947 had received religious instruction from rabbis.

The objection is made that the finding that there is no uncertainty in the phrase, "born in the Hebrew faith," is not justified by the testimony, and as a statement of law "is not consistent with the legal conclusions adopted by almost all the courts which have considered this problem and made it a basis for their decision." That is not, however, quite what the finding was. Referring to this phrase and to the words "Hebrew" and "Jewish," the judge said, "I find no such uncertainty in the meaning of these words as to make their application to the facts in this case too difficult." We think that what the judge meant is clear. He was ruling that the testator used the word "born" not in an abstruse sense such as might be understood by a theologian but in its ordinary meaning of physical birth. "'Words in a will are to be given their ordinary meaning unless an intention to use them in some different sense is shown.' *Smith* v. *Livermore,* 298 Mass. 223, 234." *Franklin Square House* v. *Siskind,* 322 Mass. 556, 559.

2. Whether the words "Jewish faith" are sufficiently definite is a question of more difficulty. The courts with whose conclusions the judge's finding is said to be incon-

sistent are either English or in the Dominions.   Of late
years testamentary conditions seeking to divest estates on
the contingency of marriage outside the Jewish religion
have been held void for uncertainty in the English courts.
*Clayton* v. *Ramsden*, [1943] A. C. 320 ("if my said daughter
. . . shall at any time after my death contract a marriage
with a person who is not of Jewish parentage and of the
Jewish faith").   *In re Blaiberg*, [1940] 1 Ch. 385 ("should
any child or grandchild of mine at any time whether before
or after my decease marry any person not of the Jewish
faith").   *In re Donn*, [1944] 1 Ch. 8 ("If any child of mine
shall intermarry with anyone not of the Jewish faith, or
if any child of mine shall intermarry with anyone whose
parents were not of the Jewish faith at the time of the birth
of the person so intermarrying with any child of mine").
*Re Moss's Trusts*, [1945] 1 All E. R. 207 ("if any child or
grandchild of mine shall intermarry with any person not a
member of the Jewish faith").   *In re Ettelson*, [1946] Vict.
L. R. 217 ("should any child of mine marry anyone not of
the Jewish religion and according to the rites and cere-
monies of the Jewish church").   *In re Myers*, [1947]
N. Z. L. R. 828 ("contracting marriage out of the Jewish
faith").   These decisions turn upon a rule of construction
that where a condition subsequent will divest an estate the
court must be able to see from the beginning precisely on
what event the vested estate will determine.   *Clavering* v.
*Ellison*, 7 H. L. Cas. 707, 725.   Under this rule of "peculiar
stringency" the matter is treated "as one to be decided as
it were in vacuo, simply on the construction of the clause."
Lord Wright in *Clayton* v. *Ramsden, supra*, 329.   The rule
does not apply to a limitation or a condition precedent.
*Re Wolffe's Will Trusts*, [1953] 2 All E. R. 697 (income to
granddaughter and on her marriage "to a person of the
Jewish faith and the child of Jewish parents" to transfer
the principal, but not if she "shall marry a person not of
the Jewish faith and not the son of parents of the Jewish
faith").   See *In re Allen*, [1953] 1 Ch. 810 (to the eldest
son of his nephew "who shall be a member of the Church

of England and an adherent to the doctrine of that Church");
*S. C.* [1954] 1 Ch. 259. For a summary of English law relating to conditions respecting particular religions, see Williams on Wills, 267 et seq.

It may be conceded that conditions, whether precedent or subsequent, tending to defeat estates are construed strictly. See Page on Wills (3d ed.) § 1280. Nevertheless we are unable to accept the doctrine of the English courts which would impress a fatal uncertainty upon the testator's language in the case at bar. Lord Romer, one of the principal expositors of the doctrine, said of "the Jewish faith" in *Clayton* v. *Ramsden,* [1943] A. C. 320, 334: "It would surely depend on the extent to which the particular individual accepted the tenets and observed the rules. I cannot avoid the conclusion that the question whether a man is of the Jewish faith is a question of degree." This is hardly the view to which we have very recently given expression in *Goldman, petitioner,* 331 Mass. 647, an adoption case under G. L. (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, requiring the judge "when practicable" to "give custody only to persons of the same religious faith as that of the child." We there said (page 649): "The mother did not cease to be a Catholic, even if she failed to live up to the ideals of her religion. If that were the test of belonging to a religious faith it is feared that few could qualify for any faith. The petitioners are of the Jewish faith and intend to bring up the twins in that faith." We do not believe the question of fact as to the religious faith of Veronica should be determined in vacuo (see *Clayton* v. *Ramsden, supra,* 329) any more than should any other question of fact.

Our conclusion that the language of the testator is not too uncertain to be enforced is aided by decisions on an analogous question. In most States where the issue has arisen, conditions imposed by testators requiring, or prohibiting, education or membership in a certain faith have been upheld. *Delaware Trust Co.* v. *FitzMaurice,* 27 Del. Ch. 101, 112–113 ("so long as she lives up to and observes and fol-

lows the teachings and faith of the Roman Catholic Church, and no longer"). *Barnum* v. *Mayor & City Council of Baltimore,* 62 Md. 275, 291 (withdraw from priesthood). *Matter of Lesser,* 158 Misc. (N. Y.) 895, 900–901 (grandchildren to be "given a normal Jewish, liberal education"). *Matter of Kempf,* 252 App. Div. (N. Y.) 28, 32–33 (grandchildren to be "brought up and educated in the faith of and according to the Roman Catholic Religion"), affirmed 278 N. Y. 613. *Magee* v. *O'Neill,* 19 S. C. 170, 186, 190 (grandchild "educated in some Roman Catholic female seminary or school," and "reared as a Roman Catholic in the communion and faith of her deceased father"). *In re Paulson's Will,* 127 Wis. 612, 618 ("attend the regular meetings of worship of the Emmanuel Church near the village of Cashton, Wisconsin, when not sick in bed, or prevented by accident or other unavoidable occurrence"). Holding to the contrary are Pennsylvania and probably Virginia. *Drace* v. *Klinedinst,* 275 Pa. 266, 268 (grandchildren "provided they remain faithful" to a particular religion). *Devlin's Trust Estate,* 284 Pa. 11, 13, 14 ("to employ the net income . . . in the education, maintenance and support of my grandson . . . but during his minority, only so long as he is brought up and reared in the Roman Catholic faith"). *Jamieson's Estate,* 55 D. & C. (Pa.) 435, 436, 441 ("if any of my daughters or their issue at the time of my decease be members of the Roman Catholic Church or shall thereafter join," legacies to cease). *Maddox* v. *Maddox's Administrator,* 11 Grat. (Va.) 804, 805, 814–815 (niece "during her single life, and forever, if her conduct should be orderly, and she remain a member of Friends Society").

The basis of the majority rule seems to be that an inducement by way of gift to adopt or to adhere to a particular religious belief is not a denial of religious freedom. The beneficiary can reject the gift. Even in Pennsylvania an inducement which operates, as in the case at bar, upon the choice of a wife has been held to be too remote to be regarded as coercive of religious faith. *Clayton's Estate,* 13

Gordon *v.* Gordon.

D. & C. (Pa.) 413, 415 (should son have "married a woman of the Roman Catholic faith").

We do not think that the provision in paragraph 14 is open to the valid charge of vagueness which was made in *Turner* v. *Evans*, 134 Md. 238 (marry a "social equal"), or in *Watts* v. *Griffin*, 137 N. C. 572 (forbidding marriage to a "common woman").

3. We cannot confine the condition in paragraph 14 only to marriages contracted in the testator's lifetime. Paragraph 14 is designed to take effect if any child "shall marry a person not born in the Hebrew faith." Not only are "shall marry" apt words to designate any future time, but the apodosis of the sentence contains language almost identical with that used in paragraph 15,[1] which purports to deprive a beneficiary who contests the will of his interests under it. Paragraph 14 provides: "then I hereby revoke the gift or gifts and the provision or provisions herein made to or for such child, and I direct that the portion or portions of my estate, and the interest or interests therein which I have by this will given to such child . . . be paid and made over to that person or persons . . . ." Paragraph 15 obviously can apply only to a condition arising subsequent to the testator's death. The same word or phrase when used in different parts of the will is presumed to have the same meaning. *Tyler* v. *City Bank Farmers Trust Co.* 314 Mass. 528, 534. *Agricultural National Bank* v. *Schwartz*, 325 Mass. 443, 448. *Hill* v. *Aldrich*, 326 Mass. 630, 632. The word "revoke" was undoubtedly used in a broad, rather than in a technical, sense. *Phillips* v. *Ferguson*, 85 Va. 509, 515. If there be inconsistency in making the gift over to those who would have been entitled "if such beneficiary had died before becoming entitled," that is to say, at the

[1] "If any beneficiary under this will shall contest the validity, or institute any proceedings to set it aside in whole or in part, then I hereby revoke the gift or gifts and the provision or provisions herein made to or for him, her or them, and I do direct that the portion or portions of my estate and the interest or interests therein which I have given to him, her or them by this will shall be paid and made over to that person or persons who would have been entitled thereto under this will, if such beneficiary had died before becoming entitled by the provisions hereof to such portion or portions, interest or interests, without leaving lawful issue."

testator's death rather than at the date of the proscribed marriage, any inconsistency is outweighed by other considerations.

4. But it is said that paragraph 14, as we have construed it, places an unreasonable restraint on marriage. This introduces a question new in this jurisdiction, where the restraints on marriage so far upheld have been those made with the intent to provide for the beneficiary while single, and not to induce the beneficiary to remain single or to forsake a present spouse. *Otis* v. *Prince*, 10 Gray, 581. *Harlow* v. *Bailey*, 189 Mass. 208, 212. *Ruggles* v. *Jewett*, 213 Mass. 167, 171. Thus, there have been held valid: A restraint on the remarriage of the testator's widow. *Knight* v. *Mahoney*, 152 Mass. 523, 525. A gift of the principal of a trust fund to a daughter "at the decease of her husband Frank E. Coe or upon her permanent and legal separation from him." *Coe* v. *Hill*, 201 Mass. 15, 17, 21–22. A trust created for the purpose of keeping property away from a son "so long as" he "shall remain the husband" of his present wife. *Cowley* v. *Twombly*, 173 Mass. 393. A gift to a nephew "on condition that at the time of the death" of the settlor the nephew "is not married to his present wife." *Chamberlain* v. *Van Horn*, 246 Mass. 462.

It is generally held in this country that partial restraints on marriage are valid unless unreasonable. Am. Law of Property, § 27.15. Scott on Trusts, § 62.6. Restatement: Property, § 425. 122 A. L. R. 7. Thus testamentary gifts conditioned on the beneficiary not marrying a specified individual have been upheld. *Turner* v. *Evans*, 134 Md. 238, 241. *Graydon's Executors* v. *Graydon*, 8 C. E. Green, 229, 237–238. *Matter of Seaman*, 218 N. Y. 77, 81. *Osborne's Petition*, 21 D. & C. (Pa.) 293, 295. A similar result has been reached where the condition was against marrying into a named family. *Phillips* v. *Ferguson*, 85 Va. 509, 513. In *Pacholder* v. *Rosenheim*, 129 Md. 455, a requirement that a niece marry with the consent of her parents was held to be good, and there was an added statement (pages 462–463)

that a second requirement of not marrying outside the Jewish faith was also good.

In *Matter of Liberman*, 279 N. Y. 458, 464, referring to *Matter of Seaman*, 218 N. Y. 77, 81, it was said: "The court there cited with approval Jarman on Wills: 'Conditions not to marry a Papist, or a Scotchman; not to marry any but a Jew . . . have also been held good.' Indeed, such conditions seem to have been sustained whenever challenged. (. . . Jarman on Law of Wills [7th ed.], p. 1497.)" The condition in the *Liberman* case, that the legatee should marry only with the consent of his mother, brother, and sister, was found upon evidence to be intended to restrain marriage with anyone but a Jewess. It was held invalid because of the consent feature. Other New York cases call valid a partial restraint such as in the case at bar. *Matter of Weil*, 124 Misc. (N. Y.) 692, 695 ("different religious faith from mine"). *Matter of Salomon*, 156 Misc. (N. Y.) 445, 447 ("any person not of the Jewish faith"). *Matter of Rosenthal*, 204 Misc. (N. Y.) 432; *S. C.* 283 App. Div. (N. Y.) 316; affirmed 307 N. Y. 715 (marriage with a person "not born in the Jewish faith and who shall not be of Jewish blood"). In each case, however, the court found a way to prevent a forfeiture of the estate. In the *Rosenthal* case there is a vigorous dissent by three judges. 307 N. Y. at page 719.

The only American case which might be said to hold a testamentary condition against marrying outside a certain religion to be unreasonable could rest on the ground that in the circumstances the restriction of the beneficiary's choice of spouse to the Society of Friends would operate as a complete prohibition of marriage. *Maddox* v. *Maddox's Administrator*, 11 Grat. (Va.) 804, 808–809.

The contention is made that a restriction conditioned upon the religious faith of the parents of the prospective wife at the time of her birth is unreasonable. The question is not whether the testator used good judgment in including paragraph 14 in his will or whether we should approve or disapprove his action. What we have to decide is whether

he was prevented from doing as he did by any rule of law. We are unable to discover that he was.

5. Constitutional objections have been raised to the judicial enforcement of paragraph 14. It is said that the decree violates the guaranty of religious freedom and is in contravention of the First and Fourteenth Amendments to the Constitution of the United States and arts. 1 and 2 of the Declaration of Rights. It is also claimed with respect to the Fourteenth Amendment that there have been a violation of the privileges and immunities clause, a denial of liberty and property without due process of law, and a denial of the equal protection of the laws. We are not impressed with these arguments. What the testator did was to make gifts of his own property subject to the legatee marrying "a person not born in the Hebrew faith." The parents' religion is prima facie the infant's religion. *Purinton* v. *Jamrock*, 195 Mass. 187, 200. *Goldman, petitioner*, 331 Mass. 647, 653. All that the testator did was in effect to require that his property should not be received by a son or daughter who should marry one born to parents not of the Hebrew faith at the time of the child's birth. There is no condition based on the religious belief of anyone at the time of marriage. In support of the constitutional arguments there are cited *Shelley* v. *Kraemer*, 334 U. S. 1, *Hurd* v. *Hodge*, 334 U. S. 24, *Barrows* v. *Jackson*, 346 U. S. 249, *Brown* v. *Board of Education of Topeka*, 347 U. S. 483, and *Bolling* v. *Sharpe*, 347 U. S. 497, which seem to us to involve quite different considerations from the right to dispose of property by will. G. L. (Ter. Ed.) c. 191, § 1.

6. The petitioners' appeal "so far as it relates to Sarah G. Lewitsky" is an attempt to terminate her interest in the trusts because of paragraph 15 of the will which she is now charged with violating by reason of the answer she has filed to the present petition and the part she has taken in opposing it. See 156 A. L. R. 980. This issue is not raised in any paper filed in the Probate Court relative to the petition, which, on the contrary, prays for a declaration that Harold's portions of the estate are from the date of his marriage

"vested in Minerva Gordon, Lillian G. Silverman, Sadye G. Freedman, May C. Pite, and Sarah G. Lewitsky." The decree is in accord with the prayer, which was never amended. The probate judge made no finding on the question, and could not have considered the issue open.[1] Essential features of due process, notice and opportunity to be heard, were lacking. *Matter of Sleeper,* 251 Mass. 6, 21. *Higgins* v. *License Commissioners of Quincy,* 308 Mass. 142, 147–148. *Matter of Keenan,* 313 Mass. 186, 201. *Becker Transportation Co. Inc.* v. *Department of Public Utilities,* 314 Mass. 522, 526. *O'Leary, petitioner,* 325 Mass. 179, 182. *Piona* v. *Alcoholic Beverages Control Commission, ante,* 53, 56. See *Hart* v. *Wiltsee,* 19 Fed. (2d) 903, 914 (C. C. A. 1). The petitioners' appeal discloses no error of law. But as they have appealed from a decree, formally at least in their own favor, their appeal will be dismissed. *Langley* v. *Conlan,* 212 Mass. 135, 140. *Walsh* v. *District Court of Springfield,* 297 Mass. 472, 474. *Sherrer* v. *Sherrer,* 320 Mass. 351, 353.

7. Costs and expenses of appeal shall be in the discretion of the Probate Court.

*Petitioners' appeal dismissed.*
*Decree affirmed.*

---

[1] We are informed by counsel that a petition seeking a declaration that Sarah has lost her interest in the estate was filed in the Probate Court on August 6, 1953.