Daniel K. MAYERS et al., Appellants

v.

Peter S. RIDLEY et al.

No. 71-1418.

United States Court of Appeals,
District of Columbia Circuit.

Reconsidered March 1, 1972.

Decided June 30, 1972.

Mr. Michael J. Waggoner, Washington, D. C., with whom Messrs. Jack B. Owens and Ralph J. Temple, Washington, D. C., were on the brief, for appellants.

Mr. Ted. D. Kuemmerling, Asst. Corp. Counsel for the District of Columbia, with whom Messrs. C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, were on the brief, for appellees.

On Reconsideration *En Banc*

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, *en banc.*

PER CURIAM:

Appellants, a group of District of Columbia residents representing the class of homeowners whose property is burdened by racial covenants, instituted this suit to enjoin the Recorder of Deeds from accepting such covenants for filing in the future and to require the Recorder to affix a sticker on each existing liber volume stating that restrictive covenants found therein are null and void. They also asked for an injunction preventing the Recorder from providing copies of instruments on file unless a similar notice is attached to the copies. The District Court dismissed their complaint, 330 F.Supp. 447 (1971), and a three-judge panel of this court affirmed that judgment. On reconsideration *en banc* of the judgment of the District Court we now reverse.

Reversed and remanded.

J. SKELLY WRIGHT, Circuit Judge, with whom BAZELON, Chief Judge,

and SPOTTSWOOD W. ROBINSON, III, Circuit Judge, join, concurring:

Appellants in this action are a group of District of Columbia residents representing the class of homeowners whose property is burdened by illegal[1] racial covenants.[2] They instituted this suit in order to enjoin the Recorder of Deeds from accepting such covenants for filing in the future. Moreover, they seek certain corrective measures which would withdraw state approval from restrictive covenants already on file. Specifically, they ask for a declaration that their rights have been violated by the recording of racial covenants, for an order requiring the Recorder to affix a sticker on each liber volume stating that restrictive covenants found therein are null and void, and for an injunction preventing the Recorder from providing copies of instruments on file unless a similar notice is attached to the copies. When the District Court dismissed their complaint, appellants renewed their arguments in this court. A three-judge panel held that the District Court should be affirmed, whereupon a majority of the judges of this court voted to reconsider the case *en banc*. We reverse.

For decades, the Recorder's office has accepted these covenants for filing and maintained them as public records.[3] Appellants contend that this official legiti-

---

1. Almost 25 years ago Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), declared judicial enforcement of restrictive racial covenants in land deeds unconstitutional. Five years after *Shelley* Mr. Justice Minton, speaking for a majority of the Justices in Barrows v. Jackson, 346 U.S. 249, 259, 73 S.Ct. 1031, 1036, 97 L.Ed. 1586 (1953), thought he was dealing with "the unworthy covenant in its last stand" and "clos[ing] the gap to the use of this covenant, so universally condemned by the courts." But while *Shelley* and *Barrows* outlawed judicial enforcement of restrictive covenants, it required legislative action to make the covenants themselves illegal. Thus Title VIII of the Fair Housing Act of 1968, 42 U.S. C. § 3604(c) (1970), makes it unlawful "[t]o make, print, or publish * * * any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin, or an intention to make any such preference, limitation, or discrimination." Since a restrictive covenant is, by its very nature, a statement of racial preference with regard to the sale of a dwelling, it is now unlawful to include such covenants in deeds even if no effort is made to enforce them. *Cf.* United States v. Lake Lucerne Land Co., N.D.Ohio, Civil Action No. C69–885, Jan. 19, 1970 (consent order). Moreover, lest any doubt remain as to this proposition, Art. 45, § 3(b) of the Police Regulations of the District of Columbia makes it unlawful to "[i]nclude in the terms or conditions of a transfer of an interest in real property any clause, condition or restriction" on the basis of race, color or national origin.

2. One gets an impression of just how noxious these covenants are by perusing some of the examples provided in appellants' complaint. One covenant provides that "no part of said land shall be sold to any negro or person of African descent or with negro or African blood in their veins." Appellants' complaint at 3. Another promises that "[n]o part of the land hereby conveyed shall ever be used, or occupied by, sold, demised, transferred, conveyed unto, or in trust for, leased, or rented, or given, to negroes or any person or persons of negro blood or extraction, or to any person of the Semitic race, blood or origin, which racial description shall be deemed to include Armenians, Jews, Hebrews, Persians and Syrians, except that; this paragraph shall not be held to exclude partial occupancy of the premises by domestic servants." *Ibid.* These are not ancient documents unearthed from a now forgotten racist past. They are contained in modern deeds involving land transactions occurring today in this city.

3. As an ironic sidelight to this case, we note that one of the early District of Columbia Recorders of Deeds was Frederick Douglass, the freed slave and renowned abolitionist leader. Although our research fails to disclose whether restrictive covenants were an issue during the post Civil War period, Douglass' autobiography does make clear that he remained a staunch foe of racism throughout his official tenure. "The office [of Recorder] * * * neither fettered my pen nor silenced my voice in the cause of my people. * * * My cause first, midst, last, and always, whether in office or out of office, was and is that of the black man

mization of racist agreements so deeply involves the state in private discrimination as to violate the due process clause of the Fifth Amendment. *See* Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). *Cf.* Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). Moreover, appellants argue, even if the Recorder's actions are constitutional, they entail the making and publication of a notice or statement of a racial preference with respect to the sale of a dwelling and, hence, are unlawful under Title VIII of the Fair Housing Act of 1968. *See* note 1 *supra.* Finally, appellants point to local statutes which permit the Recorder to accept only those documents "affecting the title or ownership of real estate," 45 D.C. Code § 701(a) (1) (1967), and which forbid him from recording instruments "not * * * executed * * * agreeably to law." 45 D.C.Code § 503 (1967). Since restrictive covenants have not affected "the title or ownership of real estate" since Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), and have not been "agreeabl[e] to law" since passage of the Fair Housing Act of 1968, appellants argue, the Recorder exceeds his statutory mandate when he accepts these documents for filing.

In response, appellees decline to meet appellants' constitutional argument. Instead, they contend that exclusion of restrictive covenants is not required by the Fair Housing Act, that such an exclusionary rule would be burdensome to administer and beyond the Recorder's statutory authority, and that in any case appellants suffer no harm because of the void covenants. For the reasons stated below, we find each of appellees' arguments unconvincing. Although they can be attacked separately on their respective merits, it is worth observing at the outset that in the aggregate they amount to no more than the sort of lame excuses for denial of racial justice which the Supreme Court rejected long ago. *See,*

e. g., Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 234, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Barrows v. Jackson, 346 U.S. 249, 257–259, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

The evils emanating from governmental acceptance of housing discrimination permeate our entire society. Generations of governmental participation in racial zoning have yielded a bitter harvest of racially segregated schools, unequal employment opportunity, deplorable overcrowding in our center cities, and virtually intractable racial polarization. *See* Hearings Before the Subcommittee on Housing and Urban Affairs of the Senate Committee on Banking and Currency on S. 1358 etc., 90th Cong., 1st Sess., at 46–47 (1967); Report of the National Advisory Commission on Civil Disorders 204, 244–245 (N.Y. Times paperback ed. 1968). It is too late in the day to argue that it is burdensome to correct these historic wrongs, or that government officials lack statutory authority to do so. These are the sorts of arguments which "have no place in the jurisprudence of a nation striving to rejoin the human race," Jones v. Alfred H. Mayer Co., 392 U.S. 409, 449 n. 6, 88 S.Ct. 2186, 2208, 20 L.Ed.2d 1189 (1968) (Mr. Justice Douglas, concurring), and which we accept at the peril of incurring a racial holocaust.

## I. Appellants' Statutory Arguments

### A. The Fair Housing Act of 1968

Title VIII of the Fair Housing Act of 1968, 42 U.S.C. § 3604(c) (1970), makes it unlawful, with certain exceptions, "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin, or an inten-

---

—not because he is black, but because he is a man, and a man subjected in this country to peculiar wrongs and hard-

ships." F. Douglass, Life and Times of Frederick Douglass 527 (Crowell-Collier ed. 1962).

tion to make any such preference, limitation, or discrimination."

In its opinion accompanying dismissal of appellants' complaint, the District Court found that the "plain import" of these words prohibited no more than conventional advertising indicating a racial preference. "[T]he language cannot reasonably be tortured to embrace anything more." With due respect to Judge Corcoran, it seems clear to us that no "torturing" is required to extract more than this rigid result from the statutory language. On its face the Act prohibits making or publishing any *"notice, statement,* or advertisement" indicating a racial preference. (Emphasis added.) Unless the words "notice" and "statement" are to be treated as surplusage, they must mean that the Act prohibits at least some communications which cannot be classified as advertisements. Although the legislative history of this section is sparse, it indicates beyond doubt that, as the words themselves suggest, Congress intended to go beyond advertising to reach other sorts of "notices" and "statements" as well. *See, e. g.,* Hearings Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary on S. 3296 etc., 89th Cong., 2d Sess., at 1105 (1966). Of course, the main purpose of a restrictive covenant is to give notice of a racial preference. And even if the word "notice" is defined in its narrowest possible sense, the covenants surely fall within the broader category of "statements."

Nor can it be doubted that when the Recorder files restrictive covenants he "make[s], print[s], [and] publish[es]" these notices and statements. It might be argued that the Recorder *prints* the covenants when he causes them to be reproduced for purposes of preservation and inspection. But more broadly, he certainly *publishes* them by collecting them in a manner that facilitates access to them by prospective buyers. Black's Law Dictionary at 1396 (4th ed. 1951) defines "publication" as "to exhibit, display, disclose or reveal." The whole purpose of the Recorder's office is to exhibit deeds in a convenient fashion so as to disclose or reveal possible clouds on the chain of title. To be sure, the Recorder does not "publish" the deeds in the sense that a newspaper publishes news copy. But we must, of course, presume that the statute was carefully drafted and that no part of it is redundant. If the framers had intended to limit the clause to publication of racial preferences in newspapers, the prohibition against "printing" notices and statements would have been sufficient to serve their purpose. The additional proscription against "publication" should therefore be read more broadly to bar all devices for making public racial preferences in the sale of real estate, whether or not they involve the printing process. *Cf., e. g.,* In re Publishing Docket in Local Newspaper, 266 Mo. 48, 49, 187 S.W. 1174, 1175 (1913). And when the clause is so read, it can scarcely be doubted that the Recorder's publication of racial covenants falls squarely within the statutory prohibition.

Finally, the statute's effect is limited to making, printing and publishing notices, statements and advertisements "with respect to the sale or rental of a dwelling that indicates any [racial] preference." Appellees argue that the statute is directed at the real estate industry, with which the Recorder has no connection. Real estate agents, they say, violate the statute by printing or publishing the racial convenants "with respect to the sale * * * of a dwelling," whereas the Recorder merely records the racial covenants in the public record. But there is, of course, nothing in the statute which limits its effectiveness to real estate agents. "Unlike other sections of the Fair Housing title, § 3604 (c) does not provide any specific exemptions or designate the persons covered, but rather · * * * applies on its face to 'anyone' printing or publishing illegal advertisements." United States v. Hunter, 4 Cir., 459 F.2d 205, 210 (1972) (footnote omitted). The statute prohibits notices of racial preference in

the transfer of real estate however published, including, presumably, publication in the public records of the District of Columbia. The "with respect" clause obviously modifies the words "notice, statement, or advertisement" immediately preceding it in the statute rather than the words "make, print, or publish." It describes the type of notice prohibited, not the mode or the author of the publication. A contrary reading of the statute would mean that a homeowner could publish in a newspaper an advertisement offering to sell his house indicating a racial preference, since newspapers are no more an arm of the real estate industry than is the Recorder. Yet the courts have clearly held that newspaper advertisements indicating a racial preference fall within the central prohibitions of the Act. See, e. g., United States v. Hunter, supra, 459 F.2d at 210. Whatever one thinks of the relationship between the Recorder and the real estate industry, it surely cannot be doubted that racially restrictive covenants have the purpose and effect of indicating a racial preference "with respect to the sale * * * of a dwelling." It follows that the Recorder's actions with regard to these covenants are prohibited by the Act even if they do not themselves directly involve the "sale * * * of a dwelling."

Moreover, assuming arguendo that the "with respect" clause was intended to modify the words "make, print, or publish," we still think the clause describes the Recorder's conduct. We think it beyond dispute that virtually all of the Recorder's activities, including his publication of racially restrictive covenants, are undertaken "with respect to the sale * * * of * * * dwelling[s]." It blinks reality to suggest that the official functions of the Recorder are unrelated to the transfer and sale of real estate. The Recorder's office is not a museum where scholars come to examine old deeds out of disinterested curiosity. It is, rather, a place where prospective buyers or their agents can quickly and easily determine the soundness of the title they are acquiring. We can take judicial notice of the fact that a visit to the Recorder's office is an ingredient in virtually every real estate transaction in this city and that, conversely, virtually everyone who visits the Recorder's office is involved in the real estate market. To say that the Recorder's publication of deeds is unconnected with the "sale or rental of * * * dwelling[s]" is to overlook the fact that such a sale may be ineffective as against a bona fide purchaser unless the deed is recorded. See 45 D.C.Code § 501 (1967). More fundamentally, such a restriction on the statutory language would ignore the day-to-day responsibilities of the Recorder's office and pointlessly limit the applicability of the Fair Housing Act.

Thus a careful textual examination of 42 U.S.C. § 3604(c) makes clear that the Recorder's activity falls within its ambit. It is unnecessary to rest upon the words of the statute alone, however, since a purposive analysis of the provision yields precisely the same result. True, there is nothing in the legislative history tending either to support or to refute the inference arising from the language that the Act prohibits statements of racial preference emanating from the Recorder's office. In all likelihood, few congressmen even addressed their thinking to this particular problem. But no court has ever held that Congress must specifically indicate how a statute should be applied in every case before the judiciary can go about the business of applying it. In Daniel v. Paul, 395 U.S. 298, 307, 89 S.Ct. 1697, 1702, 23 L.Ed. 2d 318 (1969), for example, the Supreme Court recognized that "most of the discussion in Congress regarding the coverage of Title II [of the 1964 Civil Rights Act] focused on places of spectator entertainment rather than recreational areas." Nonetheless, the Court held the Act applicable to a lake club with boating and dancing facilities, remarking that the Act's coverage should not be "restricted to the primary objects of Congress' concern" since the purpose of the law was "to remove the daily affront and

humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Id.* at 307–308, 89 S.Ct. at 1702.

Similarly, Congress has clearly stated that the purpose of the Fair Housing Act is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601 (1970). Reading Section 3604(c) to forbid the Recorder from frustrating this purpose by placing the authority of government behind illegal housing discrimination is at least consistent with, if not compelled by, ordinary canons of statutory construction. It is well established that civil rights statutes should be read expansively in order to fulfill their purpose. *See* Griffin v. Breckenridge, 403 U.S. 88, 97, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); Daniel v. Paul, *supra.* There is no reason why our reading of Section 3604(c) should not comport with this rule.[4]

Moreover, the contrary reading of the statute adopted by the District Court leads to anomalous results indeed. Such a reading authorizes governmental participation in what is now universally conceded to be an illegal endeavor—*viz.,* maintenance of a segregated housing market. It need hardly be pointed out that the strongest sort of public policy considerations argue against a construction of the statute which would permit government to become a co-conspirator in this illegal scheme. *See* Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). *Cf.* Tank Truck Rentals, Inc. v. Commissioner of Internal Revenue, 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958).

Furthermore, the District Court's reading of the statute would carve out a narrow exception to the statutory provision for the benefit of government officials. If private individuals attempted to publish or circulate racial covenants, their activity would clearly violate Section 3604(c). *See* note 1 *supra.* Yet under the opinion of the District Court, because it is a government official who violates the statutory command his activity is somehow insulated from judicial control. This position turns the old "state action" controversy on its head. Ever since the Civil Rights Cases were decided almost a century ago, it has been thought necessary to show some degree of state involvement before private discriminatory decisions could be judicially controlled.[5] *See* Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). It is simply too late in the day now to say that judicial control is impossible for the very reason that the state is involved. Whatever one thinks of state action as a viable limiting principle on the constitutional command of equality, it should at least be clear that the most outrageous deprivations of equal rights are those perpetrated by the state itself. Surely Congress must have been aware of this principle—sanctified by 100 years of "state action" litigation—when it voted to enact Section 3604(c). We are unwilling to believe that the legislators who voted for that Act intended to exempt the most serious offenses from its coverage.

### B. Local Statutes

In reply to these contentions, appellees argue that, even if Section 3604(c) can be read as precluding registration of racial covenants, local legislation in the District of Columbia Code prevents the Recorder from instituting the relief requested. The Recorder, they point

---

4. Thus it is not surprising that the few courts which have thus far dealt with § 3604(c) have construed it broadly in light of its purpose. *See* United States v. Hunter, 4 Cir., 459 F.2d 205 (1972); United States v. West Peachtree Tenth Corp., 5 Cir., 437 F.2d 221, 229 (1971). *Cf.* United States v. Bob Lawrence Realty, Inc., N.D.Ga., 313 F.Supp. 870 (1971);

United States v. Mintzes, D.Md., 304 F. Supp. 1305 (1969).

5. Of course, this generalization does not apply to legislative or judicial action to remove badges and incidents of slavery under the 13th Amendment. *See* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

out, is a ministerial officer who is bound to accept all deeds tendered to him without exercising any independent discretion.

This argument is totally without merit. In the first place, even if we assume that the Recorder is acting under statutory compulsion when he records racial covenants, this fact alone does not insulate his conduct from judicial review. The local statute which sets out the powers of the Recorder of Deeds can hardly be supposed to preempt the Fair Housing Act of 1968. Indeed, the 1968 Act explicitly provides that "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." [6] 42 U.S.C. § 3615 (1970). 42 U.S.C. § 3602(f) (1970), in turn, defines "[d]iscriminatory housing practice" to mean "an act that is unlawful under section 3604 * * * of this title." And, as argued above, recordation of restrictive covenants is made unlawful by 42 U.S.C. § 3604(c). It follows that if a part of the District of Columbia Code really forces the Recorder to violate appellants' Section 3604 rights, then that portion of the Code is *pro tanto* unlawful.

It is unnecessary for us to invalidate any provision of the District of Columbia Code, however, since we fail to perceive the statutory conflict which troubles appellees. On the contrary, as we read the local provisions, the Recorder has no choice but to reject deeds which indicate a racial preference. Thus, while it must be conceded that the Recorder is, for most purposes, a ministerial officer, 45 D.C.Code § 701(a) (1) makes clear that he is required to re-

cord only those instruments "affecting the title or ownership of real estate." Of course, it is uncontested that after Shelley v. Kraemer, *supra*, a restrictive covenant can have no effect on title or ownership. Moreover, the Police Regulations of the District of Columbia, Article 45, Section 3(b), make it illegal to include restrictive covenants in deeds, *see* note 1 *supra*, and 45 D.C.Code § 503 forbids the Recorder from recording "any instrument which shall not be executed and acknowledged agreeably to law." Since restrictive covenants are not executed "agreeably to law," the Recorder exceeds his statutory mandate when he accepts them for filing.

It is true that the old case of Dancy v. Clark, 24 App.D.C. 487 (1905), states that "the recorder of deeds is in the category of ministerial officers, and has no jurisdiction to pass upon the validity of instruments of writing presented to him for record." *Id.* at 499. But that case was decided years before it was imagined that inclusion of racial covenants in deeds would be made illegal or that state involvement with restrictive covenants was a wrong of constitutional magnitude. It stretches credulity to the breaking point to suppose that the *Dancy* court was able to foresee the 67 years of statutory and constitutional history which have transpired since its decision. Nor is there anything in *Dancy* to support the proposition that the Recorder is bound to accept a document when, by so doing, he exceeds his statutory powers and commits an injury of constitutional proportions. *See* pages 637–640 *infra*. Indeed, the *Dancy* court itself recognized that when a document is facially invalid the Recorder is justified in refusing it.[7] Of course, restrictive covenants have been facially

---

6. 42 U.S.C. § 3602(g) (1970) defines "State" to include the District of Columbia.

7. Dancy v. Clark, 24 App.D.C. 487, 499 (1905). Moreover, "even if a paper on its face appears to have been regularly executed so as to entitle it to record, and the recorder had exceeded his authority in

refusing to receive and record it, yet the court will not, by writ of mandamus, coerce his action, if it appears upon consideration of the contents of the paper that it is invalid under the law, for, in that event, to coerce his action and to command the receipt and record of the paper would be a nugatory thing in law." *Id.* at 500. This position seems to be in ac-

invalid since Shelley v. Kraemer, *supra,* was decided in 1948.

Thus, whether the Recorder's duties are viewed as discretionary or ministerial, it should at least be clear that he has not been invested with authority to break the law. We refuse to accept the paradoxical proposition that the very restrictions on the Recorder's powers which, for most purposes, make his action ministerial somehow enlarge his authority and permit him to exceed the statutory limits put on his jurisdiction. We think the statutes restricting the Recorder to the filing of instruments "affecting the title or ownership of real estate" and "executed  *  *  * agreeably to law" mean what they say and they are not to be flouted on the sophistic theory that the limits placed on the Recorder restrict his power to obey those limits.

### II.  Appellants'  Constitutional  Argument

It must be owned that the statutory arguments made above may not be entirely free from doubt. Under the circumstances, we think it appropriate to add a few words about another principle which influences our opinion. It is, of course, elementary that courts, where possible, construe a statute so as to avoid the necessity of declaring it unconstitutional. *See, e. g.,* United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); Lucas v. Alexander, 279 U.S. 573, 577, 49 S.Ct. 426, 73 L.Ed. 851 (1929). Thus if a construction of the local statutes which authorized or required the Recorder to accept restrictive covenants would mandate state action denying black citizens equal protection of the laws, that construction should, if possible, be avoided.

### A.  State Action

Any discussion of state action and equal protection must begin with a delineation of the boundaries which have defined controversies like this since Reconstruction. On the one hand, *Civil Rights Cases, supra,* makes clear that "[i]ndividual invasion of individual rights is not the subject-matter of the [Fourteenth] amendment." 109 U.S. at 11, 3 S.Ct. at 21. At the other extreme, cases like Virginia v. Rives, 100 U.S. (10 Otto) 313, 318, 25 L.Ed. 667 (1880), teach that "a State may act through different agencies,—either by its legislative, its executive, or its judicial authorities; and the prohibitions of the [Fourteenth] amendment extend to all action of the State denying equal protection of the laws, whether it be action by one of these agencies or by another."

Of course, it is no easy matter to determine where "action of the State" leaves off and "[i]ndividual invasion of individual rights" begins. As governmental responsibility for racism was more clearly perceived, the old "state action" formulation ceased to provide a bright-line test for the limits of constitutional equality. *See, e. g.,* Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), affirmed after remand, *sub nom.* Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970). Indeed, the Supreme Court itself has now conceded that "to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which 'This Court has never attempted.' " Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). This difficulty in formulating precise, principled rules for the limits

---

cord with that of most other jurisdictions. *See, e. g.,* Youngblood v. United States, 6 Cir., 141 F.2d 912, 913 (1944).

*Cf.* Appliance Buyers Credit Corp. v. Crivello, 43 Wis.2d 241, 168 N.W.2d 892, 896–897 (1969).

of state action [8] has led numerous commentators to suggest that the concept be jettisoned altogether, to be replaced by some test which balances individual interests in equality against competing interests in privacy. *See, e. g.*, Black, The Supreme Court, 1966 Term, Foreword: "State Action," Equal Protection, and California's Proposition 14, 81 Harv.L. Rev. 69 (1967); Henkin, Shelley v. Kraemer: Notes for a Revised Opinion, 110 U.Pa.L.Rev. 473 (1962); Williams, The Twilight of State Action, 41 Tex. L.Rev. 348 (1963). "State action," these commentators argue, fails to dictate decisions in close cases.

Fortunately, it is unnecessary to mediate this scholarly dispute, since this is not a close case. Whatever the vagaries of "state action" at the margin, the core concepts remain clear. When the state acts directly and unambiguously in a discriminatory manner, it violates the basic command of the Fourteenth Amendment. *Cf.* Commonwealth of Pennsylvania v. Brown, 3 Cir., 392 F.2d 120, 125, cert. denied, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968). We are not dealing here with a case where tangential state involvement is used to implicate otherwise private activity with "state action." *See, e. g.*, Burton v. Wilmington Parking Authority, *supra*; Simkins v. Moses H. Cone Memorial Hospital, 4 Cir., 323 F.2d 959 (1963); Green v. Kennedy, D.D.C., 309 F.Supp. 1127, appeal dismissed, *sub nom.* Cannon v. Green, 398 U.S. 956, 90 S.Ct. 2169, 26 L.Ed.2d 539 (1970). *Cf.* Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 172–177, 92 S.Ct. 1965, 1971–1974, 32 L.Ed.2d 627 (1972). Nor is it even a situation in which a facially neutral government statute or policy has the effect in certain situations of denying racial justice. *See* Hunter v. Erickson, *supra*; Reitman v. Mulkey, *supra*. The Recorder of Deeds is a state official, and the activities of the Recorder's office are a state responsibility. The Recorder has made a policy decision to consider illegal, racist covenants as documents "affecting the title or ownership of real estate." *See* 45 D.C.Code § 701(a) (1). If the concept of "state action" has any meaning at all, then that decision is a state decision for which the state is fully responsible.

## B. *Deprivation of Equal Rights*

Of course, a mere showing of state action is insufficient to make out an equal protection clause claim. It must also be shown that the state action has the purpose and effect of discriminating against an identifiable class in an irrational or invidious manner. *See, e. g.*, Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). In cases involving economic or social regulation not approaching sensitive and fundamental personal rights, government traditionally need show only that the state action serves some rational or legitimate purpose in order to defeat a claim of discrimination. *See* Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). *Compare* Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 171, 92 S.Ct. 1400, 1405, 31 L.Ed. 2d 768 (1972). But cases such as this one, involving alleged discrimination along racial lines, are treated differently. They are "closely scrutinized," *see, e. g.*, Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and this close scrutiny usually involves a careful balancing of a legitimate governmental purpose against the discriminatory effect of the state action.

Frequently this balancing is a difficult and delicate operation, trenching as it undeniably does upon the functions traditionally performed by legislatures. In this case, however, our scale need not be finely attuned, since there is nothing at all on one side of the balance. Simply

---

8. *Compare, e. g.*, Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), and Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), with Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970), and Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971).

put, there is no legitimate governmental interest which could possibly be served by accepting restrictive covenants for filing. These documents are analogous to forged instruments or correspondence containing threats for the purpose of extortion in that they are entirely outside the law. They are illegal to execute and illegal to enforce. Even if we assume that the Recorder's office serves as no more than a repository or storage facility, the state has no legitimate interest in protecting and preserving these malignant instruments of persecution.[9]

But of course the Recorder's office is more than a repository. It is designed not so much to store deeds for posterity as to give them some legal effect. Such a purpose with respect to restrictive covenants is violative of both the Fair Housing Act [10] and the Fourteenth Amendment.[11] If the courts cannot enforce racial covenants in the exercise of their general common law powers, Shelley v. Kraemer, *supra*, then surely the Recorder cannot effectuate them by administrative fiat.

The best that can be said for the Recorder is that his approval of these racial classifications serves no purpose—that his actions are no more than a thoughtless, noninvidious consequence of bureaucratic inertia. But bureaucratic inertia is hardly a compelling justification for preservation of this relic from an age which should have been long dead. The racism which continues to haunt this country is perpetuated by those who do not care as well as by those who hate. It provides scant comfort to blacks trapped in the slums of our inner cities to know that their jailers are thoughtless rather than heartless.[12]

The flimsy nature of the state's asserted interest in recording restrictive covenants means that even a marginal showing of discriminatory effect would be sufficient to tip the balance in appellants' favor. In truth, however, the discriminatory effect of the Recorder's practices is quite substantial. The fact that private individuals initiate the discriminatory conduct neither explains the Recorder's actions nor expiates his re-

---

9. Cases such as U. S. National Bank v. Snodgrass, 202 Or. 530, 275 P.2d 860 (1954) (*en banc*), and Gordon v. Gordon, 332 Mass. 197, 124 N.E.2d 228, *cert. denied*, 349 U.S. 947, 75 S.Ct. 875, 99 L.Ed. 1273 (1955), are totally irrelevant to the issue here. Those cases, decided almost 2 decades ago, uphold the power of the state to probate wills with discriminatory provisions over equal protection attack. Even if they can still be said to represent good law, they are limited to the situation in which the state is aiding conduct which is not itself illegal. Since no statute prevents a testator from devising his property in a discriminatory fashion, it could conceivably be argued that a state probate court has no legal basis for refusing to participate in this legal, private discrimination. The Supreme Court's recent decision in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), wherein the Court vacated an injunction against the granting of a state liquor license to private clubs with discriminatory guests practices, may be similarly distinguished. The appellee in *Moose Lodge* "conced[ed] the right of private clubs to choose members upon a discriminatory basis." 407 U.S. at 171, 92 S.Ct. at 1970. In contrast, our appellant makes no parallel concession as to the right of private homeowners to discriminate. Of course, private discrimination in the sale of housing has been illegal since Jones v. Alfred H. Mayer Co., *supra* note 5. Thus the only justification for the Recorder's acceptance of racial covenants is to effectuate conduct which is wholly illegal. It goes without saying that this is in fact no justification at all.

10. *See* 42 U.S.C.A. § 3604(a).

11. *See* Shelley v. Kraemer, *supra* note 1.

12. "Whatever the law was once, it is a testament to our maturing concept of equality that, with the help of Supreme Court decisions in the last decade, we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme." Hobson v. Hansen, D.D.C., 269 F.Supp. 401, 497 (1967), *affirmed, sub nom.* Smuck v. Hobson, 132 U.S.App. D.C. 372, 408 F.2d 175 (1969) (*en banc*).

sponsibility. Supreme Court "cases make clear that the impetus for the forbidden discrimination need not originate with the State if it is state action that enforces privately originated discrimination." Moose Lodge No. 107 v. Irvis, *supra*, 407 U.S. at 172, 92 S.Ct. at 1971. The Recorder's manifest encouragement of private discrimination is offensive to equal protection quite apart from the activity of private citizens who seize upon his actions to justify their illegal conduct. The state is not permitted to "[furnish] a vehicle by which racial prejudice may be so aroused as to operate against one group because of race and for another." Anderson v. Martin, 375 U.S. 399, 402, 84 S.Ct. 454, 456, 11 L.Ed.2d 430 (1964). By accepting restrictive covenants for official filing, the Recorder puts government's seal of approval on racist documents deeply offensive to black citizens and thereby "affect[s] their hearts and minds in a way unlikely ever to be undone." Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Moreover, this court can take judicial notice of the fact that official recording of these documents is likely to give them a legitimacy and effectiveness in the eyes of laymen which they do not have in law. It is certainly not beyond the realm of possibility that a black person might be reluctant to buy a home in a white neighborhood when government itself implicitly recognizes racially restrictive covenants as "affecting the title or ownership of real estate." Indeed, the white character of that part of the District where recorded racist covenants abound stands as mute testimony to their continued effectiveness.

Finally, even if the subtle but real damage described above is considered too remote or speculative to receive judicial recognition, it still cannot be said that appellants have failed to make out a constitutional claim. "The vice lies not in the resulting injury but in the placing of the power of the State behind a racial classification that induces racial prejudice * * *." Anderson v. Mar-

tin, *supra*, 375 U.S. at 402, 84 S.Ct. at 456. Such classifications bear a "heavy burden of justification," Loving v. Virginia, *supra*, 388 U.S. at 9, and it has never been thought necessary to prove that actual harm derives from them before they can be invalidated. *See* Bryant v. State Board of Assessment of N. C., E.D.N.C., 293 F.Supp. 1379 (1968); Hamm v. Virginia State Board of Elections, .E.D.Va., 230 F.Supp. 156 (1964). Instead, the burden of proof is on government to demonstrate some strong reason which justifies the classification. *See* McLaughlin v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Lee v. Nyquist, W.D.N.Y., 318 F.Supp. 710, 719 (1970). Yet, as demonstrated above, appellees here have not even begun to make such a demonstration. Unless we are prepared, at this late date, to give up the battle for racial justice in the name of blind obeisance to the doctrine of judicial restraint, the Recorder's practices cannot be permitted to continue.

## III. Appellees' Contentions

If we understand appellees' position correctly, they wisely do not contest the validity of the constitutional arguments made above. But whereas one would think this concession would make an end of the case, appellees go on to raise a number of supposed practical and technical difficulties which, they contend, preclude the relief requested. Given the overwhelming constitutional and statutory imperatives which dictate a contrary result, it is hardly surprising that these arguments barely rise to the level of makeweight.

### A. Standing

Appellees first argue that, whatever the constitutional injury suffered by blacks because of the Recorder's actions, the white appellants in this case are not harmed. Since the racial covenants are a legal nullity, it is contended, the Recorder's publication of them in no

way affects appellants' titles and thus deprives them of no rights.

But while such an argument might have some validity in a different context, it ignores the Supreme Court's willingness to relax rigid standing requirements when dealing with restrictive covenants. In Barrows v. Jackson, *supra,* for example, the Supreme Court explicitly held that it would permit white homeowners whose land was burdened by racial covenants to assert the constitutional rights of prospective black buyers. "Under the peculiar circumstances of this case, we believe the reasons which underlie our rule denying standing to raise another's rights, which is only a rule of practice, are outweighed by the need to protect the fundamental rights which would be denied by permitting the damages action to be maintained." 346 U.S. at 257, 73 S.Ct. at 1035. *See also* Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).

Moreover, it is inaccurate to say that white homeowners suffer *no* injury caused by the recording of these covenants. A certain percentage of blacks no doubt refuse to buy property burdened with such recorded covenants either because they are under misapprehension as to the legal effect of the covenants or because they do not want to go where they appear to be unwanted, whatever their legal rights. To the extent these blacks decline to bid for title to appellants' property, the marketability of that property suffers. *Cf.* Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917). Nor is it relevant that this diminution of marketability is caused by extralegal factors. It has never been thought that a cloud upon one's title had to constitute a valid legal claim before a court sitting in equity could remove it. Indeed, the whole purpose of a traditional action to quiet title was to clarify the status of putatively *invalid* claims. *See, e. g.,* Barnes v. Boyd, S.D.W.Va., 8 F.Supp. 584, 597, affirmed, 4 Cir., 73 F.2d 910 (1934), cert. denied, 294 U.S. 723, 55 S.Ct. 550,

79 L.Ed. 1254 (1935). Surely if our courts possess the institutional competence to wrestle with contingent remainders and the Rule Against Perpetuities in such an action, they can also vindicate basic constitutional and statutory rights.

### B. Administrative Burden

Next, appellees contend that it would be inconvenient and burdensome for them to implement the relief requested and that full implementation might require employment of some additional personnel. We can all join in sincerely regretting the fact that recognition of appellants' rights may impose some additional burdens on the Recorder's office. But surely appellees do not mean to contend that they can go on violating the constitutional and statutory rights of black citizens because such violations suit the Recorder's administrative convenience. *Cf.* Carrington v. Rash, 380 U.S. 89, 96, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). Seventeen years of bitter and continuing struggle over school desegregation have made clear that vindication of constitutional rights is not always easy. But we do not have a constitutional system of government because that is the easiest or most efficient means of running a country. The guarantees of the Fifth and Fourteenth Amendments were written into the Constitution for the very purpose of preventing some future goverment official from ignoring the demands of equality for the sake of short term "convenience." *Cf.* Cooper v. Aaron, *supra,* 358 U.S. at 16–17, 78 S.Ct. 1401; Buchanan v. Warley, *supra,* 245 U.S. at 81, 38 S.Ct. 16.

Moreover, it should be noted that the parade of horribles to which appellees point is largely imaginary. Appellants have scrupulously and conscientiously tailored their requested relief so as to minimize interference with the Recorder's normal routine. Appellants are not asking the Recorder to go through the thousands of deeds presently on file in a search for restrictive covenants. Nor are they requesting that the tenor of any

recorded deed be changed. Instead, they ask only that *in the future* the Recorder not accept deeds with restrictive covenants in them. With respect to deeds already on file, appellants wish the Recorder to attach a notice indicating restrictive covenants are void to the liber volumes in which such covenants might be found and to copies made of recorded deeds containing such covenants. So far as we can see, the latter elements of this relief could be effectuated by the purchase of a large rubber stamp—surely not too great a price to pay for vindication of constitutional rights.

It is true that, with respect to future deeds, someone in the Recorder's office would have to read the documents to determine whether they contain any illegal covenants. But these deeds must be read in any event to ensure that they are written in English, clearly identify the parties, contain no obscenities,[13] and are otherwise executed "agreeably to law." 45 D.C.Code § 503. The vast majority of deeds filed today contain no racial agreements,[14] and hence could be routinely approved for filing. Most deeds which do contain such covenants incorporate agreements drafted in an earlier era before it was fashionable or necessary for racism to be coy. These provisions are brutally and disgustingly frank,[15] and could easily be filtered out by middle level personnel without extensive legal training. *Cf.* United States v. Hunter, *supra,* 459 F.2d at 213 ("a publisher can readily determine from the face of an advertisement whether it is intended to express a discriminatory preference"). Thus only a very few deeds with ambiguous or borderline pro-

visions would have to be referred to a lawyer for a legal determination. In any case where really serious doubt arose, declaratory judgment procedures are available to secure a binding judicial determination of the document's tenor. It is therefore difficult to escape the suspicion that the so-called burdens to which appellees point are in reality no more than feeble excuses invented as a *post hoc* justification for bureaucratic intransigence.

## C. Deference to Legislative Action

Finally, appellees suggest that appellants should address their complaints of racial discrimination to the political branch of government and that attempting to wrench social reform from the judiciary disregards the principle of separation of powers. But while we must, of course, maintain proper respect for the jurisdiction of coordinate branches of government, under our law the judiciary too has the obligation of enforcing constitutional rights. As shown in Part II of this opinion, the due process clause of the Fifth Amendment prohibits official recording of restrictive covenants. It therefore becomes the duty of the judicial branch to enforce appellants' constitutional rights by enjoining this practice. The fact that Congress also possesses the unquestioned power to enforce constitutional rights by appropriate legislation has never been thought to relieve the judiciary of its responsibility in this area. Indeed it was the Framers' fear of majoritarian pressure on the political branch that has resulted in the judiciary becoming the primary guardian of the Bill of Rights. "The

---

13. Apparently the Recorder presently screens all deeds submitted to him to ensure that they meet these requirements. Appellants' assertion to this effect before the trial court was not challenged by appellees and, for purposes of summary judgment, must be assumed to be true. *See* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss the Complaint at 6.

14. At the request of the Justice Department, the major title companies have

agreed not to report the existence of racial covenants appearing in the records of title on property for which they issue title insurance. *See* Exhibit A attached to Plaintiffs' Memorandum of Points and Authorities, *supra* note 13. At oral argument, the panel which initially heard this case was informed that these companies are responsible for about 95% of the deeds presented to the Recorder for filing.

15. *See* note 2 *supra.*

very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1942).

Moreover, the argument for awaiting congressional action overlooks the fact that Congress *has* acted in this field. It acted in 1866 when it passed sweeping civil rights legislation guaranteeing to all United States citizens the "same right * * * as is enjoyed by white citizens * * * to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982 (1970). It acted again in 1868 when it adopted the Fourteenth Amendment, thereby establishing universal citizenship and equal rights under law. And it acted most recently in 1968 when comprehensive fair housing legislation was written into law for the purpose of "provid[ing], within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601 (1970).

Now the time has come for the courts to act. We have already waited entirely too long to wipe out the last vestiges of the official discrimination which has tainted the housing market from time out of mind. The judgment of the District Court must therefore be reversed and the cause remanded.

WILKEY, Circuit Judge, with whom Circuit Judges McGOWAN and LEVENTHAL concur.

Judge Wright's opinion is infused throughout with broad constitutional discussions and assumptions, with which not all members of the majority are in complete accord. Therefore, it seems desirable to set forth separately the more limited rationale on which several members of the court do in fact agree.

The doctrine of judicial restraint, that cautions a court to avoid decision of constitutional questions when not necessary for disposition of a controversy, applies also, we think, to serious reliance on an application of constitutional principles. This is particularly true when the constitutional principles, although they may be sound, are certainly not either controlled by direct precedent or entirely free from doubt.

There is also an interrelated statutory doctrine, that statutes should be construed to avoid serious constitutional problems. In the case at bar we believe that the relevant statutes not only make a more limited statutory rationale available for decision, but such statutory rationale is entirely convincing as a sound course. Specifically, even if we assume —and we do not purport to say—that this action would have to fail if grounded on broad constitutional arguments alone, we are convinced that these statutory provisions entitle plaintiffs to relief that was erroneously withheld by the District Court.

In many respects this opinion not only reaches the same conclusion as to disposition, but also uses the same materials, as the opinion authored by Judge Wright. But the approach is significantly different. This opinion begins with an analysis of the functions of the D.C. Recorder of Deeds. The point is not that the D.C. provisions are unique or unusual. On the contrary, the functions of the D.C. Recorder of Deeds are, generally speaking, similar to the functions of that kind of official in the various states.

What is gained from a detailed examination of his functions is a perspective that clarifies the scope of the Fair Housing Act, as it applies to the Recorder's functions. That approach also shows why the appellees' arguments based on various practical and technical difficul-

ties are without substance. Our central position is that the Fair Housing Act of 1968, which prohibits the publishing of notices or statements with respect to the sale of dwellings indicating any discrimination based on race, color or national origin, read as it must be in the pertinent statutory and decisional context, does apply to the functions of the Recorder of Deeds.

## I. The Recorder's Office Under the District of Columbia Statutes

To begin at the beginning, the statutes and actual practice demonstrate that the primary function of the Recorder is not to preserve records but to provide public notice of them. After a deed is filed for recordation, it is returned to the current owner of the property, who, we may assume, ordinarily retains it in whatever manner he is accustomed to preserve his important papers or valuable possessions. If the Recorder were merely a "conservator," he could accomplish this purpose by providing vaults in which the original deed could be pigeonholed, with access limited to the Recorder's office and the owner of the property, the mortgagee, or other claiming an interest therein. But the Recorder does not pigeonhole the deed. He spreads it upon folio volumes in the public record for all the world to examine and see.

### A. Recording required to give notice.

The purpose of this, and that this function is the primary role of the Recorder, is implicit in the age-old common law of real property with regard to bona fide third purchasers, codified in 45 D.C.Code § 501:

> Any deed conveying real property in the District . . . as to creditors and subsequent bona fide purchasers and mortgagees without notice of such deed, and others interested in said property, it shall only take effect from the time of its delivery to the Recorder of Deeds for record.

The same section of the statute provides that, as between the parties and as to all other persons except those listed above, the deed takes effect from the date of delivery. Thus, while the unrecorded deed passes title,[1] the recording of the deed has definite legal consequences, inasmuch as it is statutorily required to protect the grantee's title against creditors, subsequent bona fide purchasers and mortgagees without notice of the deed, and others interested in the property.

Furthermore, not only must owners of real property record their deeds or else risk losing title to those listed in the statute, subsequent purchasers of the property must examine the records or else risk not obtaining proper title. Recourse to the Recorder's office is required both before and after delivery of a deed, first to obtain information as to title, and last to give notice to all others of the transfer of title to protect the new owner's interest. It is obviously the duty to provide public notice and to make copies of deeds available on demand, not the mere safe-deposit-vault preservation of the deeds, which is the most important function of the Recorder.

### B. Recording prohibited where instrument not executed and acknowledged agreeably to law.

That the Recorder is not just a passive repository, like the safe deposit box at a bank, is shown by the second relevant D.C. statute, 45 D.C.Code § 503, which forbids the Recorder to accept "for record or record any instrument which shall not be executed and acknowledged agreeably to law . . . ." It is not indubitably clear what the words "not be executed and acknowledged agreeably to law" mean. The more limited interpretation is that if there is an apparent irregularity in the mode of execution or acknowledgment of the deed (i. e., the correct number of signatures, witnesses, seals, etc.), the Re-

---

1. Intermountain Lumber Co. v. Radetsky, 75 Colo. 570, 227 P. 564, 33 A.L.R. 844 (1924).

corder is required to reject it, and that this is as far as he should go in his examination. This could be accomplished without reading any part of the deed except the acknowledgment, not necessarily even the descriptions of the parties or the property.

The cases cited under this statute have not given such a limited interpretation, however. In Dancy v. Clark it was held that the Recorder ". . . is by the law required to receive and file . . . such instuments as have been duly executed, and which purport on their face to be of the nature of the instruments *entitled* to be filed or recorded." [2] At the very least this means that the Recorder is to give the deeds a cursory reading to determine whether they "purport on their face" to be the kind of document "entitled to be filed." *Dancy* itself sustains this broader interpretation of the Recorder's duties, for there our court held that "even if a paper on its face appears to have been regularly executed so as to entitle it to record . . . yet the court will not, by writ of mandamus, coerce his action *if it appears upon consideration of the contents of the paper that it is invalid under the law, . . .*" [3] In *Dancy* the invalidity under the law was an improper specification of corporate purposes, an invalidity which appears to be much more difficult of definition and detection than a racially restrictive covenant.

According to the allegations of the plaintiffs, the present practice of the Recorder is to refuse instruments that are not in English, that contain obscenities, or that do not identify the parties. Since these allegations of plaintiffs are uncontradicted, and this case comes on appeal from the District Court's grant of defendant's motion to dismiss for failure to state a cause of action, plaintiffs' allegations as to the Recorder's

current practice must be accepted. Thus the Recorder does screen all deeds submitted to him to insure that they are agreeable to law.

It would be difficult to deny that, if the Recorder can define and detect obscenity, he can define and detect virtually any other illegality, including easily a racially discriminatory covenant.

C. *Inclusion of racially restrictive covenant prohibited.*

The third relevant statute is Article 45, § 3(b), of the Police Regulations of the District of Columbia (1967), which makes it illegal to include a racially restrictive covenant "in the terms or conditions of a transfer of an interest in real property." [4] This appears to be a definite determination that a deed (an instrument used in the transfer of property) *is not executed agreeably to law* if it contains such a racially restrictive covenant.

Under the plain language of § 503 and Article 45, § 3(b), of the Police Regulations, the Recorder's duties require him to reject deeds which contain restrictive covenants. He has an affirmative obligation to insure that deeds are executed "agreeably to law." Far from being a mere receptacle or storage box for preservation purposes, the Recorder has duties requiring his exercise of some legal judgment at the time he receives a deed (or rejects it), and further important duties requiring his placing the deed of record in a manner that will give notice to all making inquiry relating thereto.

D. *The Recorder's actions—Pragmatic considerations.*

Having seen something of the statutory framework in which the Recorder's office operates, let us examine some practical considerations bearing on what

---

2. 24 App.D.C. 487, 499 (1905) (emphasis supplied).

3. *Ibid.* (emphasis supplied).

4. "[I]t shall be a violation of this Article for any person to do any of the following

because of the race, color, religion or national origin of any individual.
    *    *    *    *    *
"(b) Include in the terms or conditions of a transfer of an interest in real property any clause, condition or restriction."

the Recorder now does and what the appellants claim he should do in regard to rejecting the filing of deeds containing racially restrictive covenants.

1. It may well be that "determining whether a covenant in a deed is a racially restrictive covenant demands a legal judgment," as the original panel opinion states, but it does not necessarily follow that "the clerical staff of the Recorder certainly does not have the knowledge, capacity or acumen to perform the tasks asked of them by appellants." The Recorder is today making a legal judgment on the validity of the acknowledgment, a legal question whose answer has frequently involved vast sums.[5] The Recorder is making a further legal judgment on the presence of obscenity, which requires a reading of the deed, as well as an examination of the description of the parties, and an ascertainment that the deed is in English. Furthermore, the Recorder has rejected deeds for other reasons of legal invalidity, and been sustained in so doing, as in Dancy v. Clark, *supra*.

2. The burden on the Recorder in performing these tasks and the effort he would have to make in examining for racially restrictive covenants is not as great as has been argued. A substantial percentage of the deeds recorded are the so-called "short-form," "Law Reporter," or "D.C.Code" deeds, the standardized form deed found at 45 D.C. Code § 301. These form deeds contain no racially restrictive covenants, and immediate identification of the deed as a form deed obviates the necessity of detailed examination.

Furthermore, as Judge Wright's opinion points out (Op., p. 642, fn. 14), at oral argument it was conceded that the major title companies are responsible for 95% of the deeds presented for recordation, and these same companies have agreed with the Justice Department not to report racially restrictive covenants in their title policies. (The implications of this re the 1968 Act are discussed more fully, *infra*.) Whether this means the title companies cause the dropping out of racial covenants in all or a substantial portion of this 95% of all deeds recorded is unclear in the record at this stage. What does undeniably appear true however, is that, given the use of D.C.Code form deeds and the position of the major title companies, a search for racial covenants would be required in only a small percentage of deeds offered for recordation.

3. We are not dealing here with the Recorder in a completely passive, receptive role. He has an "affirmative obligation to act" or not act, depending on what he finds in the deed. His action has specific legal consequences for the grantee and possibly for numerous other parties, because the validity of the deed among them hinges upon the action taken by the Recorder. 45 D.C.Code § 501, *supra*.

4. Even if a determination in favor of the plaintiffs, granting a declaratory judgment and an injunction defining the Recorder's actions, would place an additional administrative burden on him, that is no valid objection if in truth and in fact the petitioned action is called for by the law.

E. *Decisions holding the Recorder is not obligated to record certain deeds.*

Neither our own research nor that of the parties has uncovered a case in the same position as the one at bar, *i. e.*, parties seeking a blanket prohibition against the Recorder of Deeds' recording a certain deed or type deed. Usually the situation arises in the reverse, *i. e.*, the Recorder of Deeds has exercised his non-neutral legal judgment as to whether a document is subject to recording or not, has rejected it, and has been upheld by the courts.

The only case in this jurisdiction is Dancy v. Clark, *supra*, in which our court

---

5. *See, e. g.*, Humble Oil & Refining Co. v. Downey, 143 Tex. 171, 183 S.W.2d 426 (1944) (conveyance by lease of properties worth many millions of dollars set aside because of a faulty acknowledgment).

refused to grant mandamus to compel the Recorder to file a certificate of incorporation where there was an improper specification of corporate purposes. Our court thus upheld the "nonneutral" act of the Recorder in refusing to accept an invalid document.

Similarly, in Youngblood v. United States [6] the Sixth Circuit held that the Wayne County Registrar of Deeds was justified in refusing to record a federal tax lien which did not comply with the statutory direction to include a description of the property covered by the lien. *In re Finkelstein* involved a more difficult legal judgment, in that the New York court held that an assignment for wages given as security for payment of a debt was given in a manner which violated a New York statute, and therefore the County Clerk was correct in his exercise of legal judgment and refusal to file the assignment.[7]

Various decisions in which the submitted document is similar to or an abridgment of a document, which under the statute would be entitled to recordation, have held that the abridgment or similar document is not entitled to recordation because it does not fall squarely within the statute. The Maryland court in 1966 held a shortened version of a longer writing (lease agreement) was not entitled to recordation even though the original document would have been.[8] Likewise, in 1969 Wisconsin held the Registrar of Deeds was correct in refusing to accept for filing a lease of personal property, although he would have been required to accept a conditional sales contract or chattel mortgage.[9] In Ohio an accepted "offer to purchase" was held not to be equivalent to an "executory installment contract" for the sale of land, and thus the court granted mandamus to compel the County Recorder to expunge and cancel the "offer to purchase" from his records.[10]

With the Recorder in the opposite position, cases have arisen in several jurisdictions where the Recorder has erroneously filed a document and in subsequent litigation the court has held that, because the document under the recordation or other statute was not entitled to be filed, the recordation would not constitute constructive notice to subsequent purchasers of the property from the original grantor, and thus the recordation was without legal effect.[11]

Taken together, these cases show that Recorders in various states exercise their legal judgment in accepting or refusing documents tendered for recordation, and that in making such legal judgments they have been upheld by the courts. Or, if in error, their action has been corrected, as in the Ohio case where an erroneous legal judgment by the County Recorder was reversed, in that he was required to expunge from his records a document he never should have recorded in the first place.

Logically, it would seem that in any of these cases, if an interested party had sought a prohibition against the Recorder filing the document which was not entitled to be filed, the court would have granted such a prohibition. In the case at bar we have documents which are objected to because the racially restrictive clause is void and of no legal effect, its enforcement is prohibited, the Recorder's placing such a deed clause of record would give legal notice to no one; therefore, on the rationale of the above cases, the Recorder should be prohibited from filing it in the first place.

6. 141 F.2d 912 (6th Cir. 1944).

7. 11 Misc.2d 938, 174 N.Y.S.2d 126 (1958).

8. Motels of Maryland, Inc. v. Baltimore County, 244 Md. 306, 223 A.2d 609 (1966).

9. Appliance Buyers Credit Corp. v. Crivello, 43 Wis.2d 241, 168 N.W.2d 892 (1969).

10. State ex rel. Puthoff v. Cullen, 5 Ohio App.2d 13, 213 N.E.2d 201 (1966).

11. *See, e. g.*, Tandy v. Dickinson, 371 S.W. 2d 81 (Texas Civ.App., 1963); Low v. Sanger, 478 P.2d 60 (Wyo.1970).

This would seem unquestionably true if an individual action were brought to prohibit the filing of any individual deed with a racially restrictive covenant. What is asked for in the case at bar is a blanket prohibition in advance against accepting such deeds for recordation. While a different question, the difference appears, not in the legal principle involved, but possibly in the practicalities of the functioning of the Recorder's office. For the purposes of the motion to dismiss in this case the facts are established that the Recorder *does now* reject deeds not executed agreeably to law, and that requiring him to reject deeds containing racially restrictive covenants would be consistent with his present administrative practice.

This assumes that deeds containing racially restrictive covenants are not executed agreeably to law. Since Shelley v. Kraemer,[12] such clauses have been legal nullities, but this in itself may not be thought to justify court action regulating the Recorder's conduct. We have noted the District of Columbia Police Regulation, Art. 45, § 4(b), which plainly states, "[I]t shall be a violation . . . because of the race, color, religion or national origin of any individual . . . [to] [i]nclude in the terms or conditions of a transfer of an interest in real property any clause, condition or restriction." This alone would serve to prohibit the Recorder from accepting deeds in violation of this Regulation—they could not have been "executed agreeably to law"—but there is also a prohibition of greater force and dignity to which we now turn.

## II. Title VIII of the Fair Housing Act of 1968 (42 U.S.C. § 3604(c))

### A. The face of the statute.

After having analyzed the statutes applying specifically to the District of Columbia, and the practice of the Recorder's Office here and in other jurisdictions, the decisive factor in the disposition of the case at bar becomes Title VIII of the Fair Housing Act of 1968,[13] which makes it unlawful

> [t]o make, *print*, or *publish*, or cause to be made, printed, or published any *notice, statement*, or advertisement, with respect to the *sale* or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin, or intention to make any such preference, limitation, or discrimination.

The words emphasized in the statute quoted are the words whose interpretation determines the decision we make here.

1. We could say that the Recorder *prints* notices of the sale of real property in that he causes the deeds to be photographed and bound into books. But, more importantly, the Recorder *publishes* such notices or statements with respect to the sale of dwellings. As defined by Webster's Unabridged Dictionary,[14] the word "publish" is used to "make public, to make known to people in general; . . . to divulge, promulgate or proclaim . . . ." Black's Law Dictionary defines "publication" to include "to exhibit, display, disclose or reveal." [15] This is precisely what the Recorder does with a deed; his is the office in which the deed is made publicly known; he divulges or promulgates it; to one taking the trouble to come to the Recorder's office, the deed is announced or proclaimed, exhibited, displayed, disclosed or revealed. As pointed out above, under 45 D.C.Code § 501 the deed is not effective as to creditors, mortgagees, innocent purchasers without notice, or to other interested parties until it is filed for recordation in the Recorder's office.

Whether the action of the Recorder be viewed as necessary before or after the sale is immaterial, because the statute

---

12. 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

13. 42 U.S.C. § 3604(c) (1970).

14. Webster's New International Dictionary (1931 ed.), at 1731.

15. Black's Law Dictionary 1396 (4th ed. 1951).

itself does not refer to the publishing of notices before or after a sale of a dwelling. We are all familiar with notices which are published after the event, such as the notices put on the financial pages of newspapers in regard to the declaration of a dividend or the consummation of a large financial transaction sponsored by certain listed investment houses.

We might compare a newspaper carrying legal notices. If a newspaper should carry the text of a deed with a racially restrictive covenant, could anyone argue that the newspaper did not *publish* this notice? The Recorder's role in regard to real estate deeds is similar to the newspaper's role with regard to the publication of legal notices. The newspaper is physically carried to the reader, whereas the reader must physically transport himself to the Recorder's office to read the deed, unless, as is frequently done, he has a title company make an abstract of every deed in his chain of title from the records in the Recorder's office. The purpose and effect of recording the deed in the Recorder's office, or putting a legal notice in a newspaper column, is the same; both give notice to the world, both are published.

2. Turning to the words *notice, statement,* or *advertisement,* unless the words *notice* and *statement* are to be treated as surplusage, they must be interpreted to mean that the Fair Housing Act prohibits other types of communications besides advertisements. "Advertisements" carries the connotation of a communication to induce one to enter into a commercial transaction, while the word "notice" carries the connotation of a communication for a legal purpose. As we have seen above, the legal purpose of recording the deed is not to pass title between the grantor and the grantee—this is by statute effective on delivery of the deed—the legal purpose is to give *notice* to innocent purchasers, mortgagees, and other interested parties.

3. "With respect to the *sale* or rental of a dwelling" necessarily involves a deed and its recordation. A deed properly recorded is the only type legal instrument which can consummate the sale of a dwelling. While it may be strictly correct to say the Recorder himself does not do any selling or renting, he is involved in the commercial real estate market, both before and after a sale. Two indispensable ingredients of any real estate transaction are a visit to the Recorder's office to check the title before the sale, and a visit to the Recorder's office to file the deed for record after the sale.

We have referred to the role of title insurance companies, the usual link between the official records of the Recorder and the buyer and seller in a real estate transaction. Highly significant for the interpretation we make here of the Fair Housing Act (§ 3604(c)) applicability to the Recorder is the similar applicability to the title companies previously asserted by the Department of Justice. By letter of 26 November 1969 to eighteen major title insurance companies in the District of Columbia the Department of Justice advised that the Fair Housing Act of 1968 "broadened the *Shelley* [16] prohibition to cover not only judicial enforcement of such covenants, but also their inclusion in public documents such as deeds or insurance policies." [17] The Department informed the companies they were violating the law by their practice of reporting the existence of racial restrictions appearing in the records of title on property for which they were issuing title insurance policies. All eighteen title companies replied that in future policies they would eliminate any reference to such restrictions.

The interpretation of the 1968 Act as applying to the title companies applies with even more obvious logic to the Recorder himself. If a deed can be considered a publication, it can only be an effective publication when it is recorded

---

16. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

17. Exhibit A, attached to Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss the Complaint.

for the world to see. The title abstracts and recitals of restrictions in title insurance policies are but republications, taken from the Recorder's official records. If the title companies' publications are covered by § 3604(c), so must be the Recorder's publications.

We thus conclude that the Recorder in the District of Columbia does "publish . . . a notice, statement, . . . with respect to the sale . . . of a dwelling . . . ." If he publishes such a notice which "indicates any preference, limitation, or discrimination based on race, color, religion, or national origin," then he does so in violation of 42 U.S.C. § 3604(c). At the very least, appellants would seem to be entitled to the first item of their requested relief, a declaratory judgment that if the Recorder so does he acts in violation of law. Logically, on the authority in this and other jurisdictions, he can be restrained in advance from violation of law, particularly since it is undenied that his conduct up to now has been in complete disregard of the applicability of this law.[18]

Our conclusion in this regard is reinforced by another section of the Fair Housing Act, 42 U.S.C. § 3615, which provides in pertinent part that . . . the law of a "State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a *discriminatory housing practice* under this subchapter shall to that extent be invalid." (Emphasis supplied.)

Section 3602 defines "discriminatory housing practice" as "an act that is unlawful under Section 3604, 3605, or 3606

of this title." Section 3604(c) is the provision with which we have been most directly concerned, the section which prohibits the *publishing* of any discriminatory *"notice*, statement, or advertisement."

Thus, ignoring Article 45, § 3(b), of the D.C. Police Regulations, even if under previous District of Columbia law the Recorder has been permitted to be a "neutral repository" in regard to discriminatory racial covenants, since § 3615 voids any law of a political subdivision that "permit[s] any action that would be a discriminatory housing practice," and the *publishing* of racially restrictive covenants is defined by § 3604(c) as such activity, the Recorder of Deeds of the District of Columbia, whatever his original role, is no longer permitted to be a passive repository when it comes to recording—and thus publishing—racially restrictive covenants. Whether he has thought of it before or not, when the Recorder publishes the notice of the sale of a dwelling, *i. e.*, records a deed containing discriminatory racial covenants for the world to see, he is engaging in an act unlawful under § 3604(c); he thus is also engaging in a discriminatory housing practice as defined by § 3602, and to whatever extent his actions in accepting and recording without question discriminatory racial covenants have been authorized by D.C. law, to that extent the D.C. law is invalid.

Another point made in Dancy v. Clark, *supra*, is relevant here. In *Dancy* this court observed that the Recorder of Deeds, though "in the category of ministerial officers," nevertheless "is not

18. Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970), relied on by the original panel opinion to show that all racial restrictions are not required to be wiped away by the courts, is not to the contrary. *Abney* held that the *Cy Pres* doctrine of trusts may not be applied where it was clear that the testator did not intend such application when it resulted in a mixing of the races that the testator felt unwise. This was sustained by the Supreme Court on the grounds that it has always been state policy to uphold

the intentions of testators, and nothing yet enacted by Congress or to be found in the Constitution has changed that. In the field of housing discrimination, the reverse is true. There is now a congressional mandate that racially restrictive covenants may not be permitted in the selling or renting of dwellings, 42 U.S.C. § 3601 (also a D.C. Police Regulation to the same effect); thus, this area of law, the selling or rental of real estate is different from the devising of real estate, which was involved in Evans v. Abney.

. . . wholly without discretion to determine whether any instrument of writing should be admitted to record." [19] The *Dancy* court gives as an example of this discretion, "if a promissory note, or a deed of conveyance of land, or a chattel mortgage, were offered to him to be filed as a certificate of incorporation, he would certainly be warranted in a refusal to receive it." Taking another example, if the Recorder were asked to record a devise of land that was a patent violation of the rule against perpetuities, and therefore invalid, he would have the discretion to refuse to record it, if such invalidity were somhow brought to his attention, and *Dancy* tells us that this refusal to record would be upheld by the courts.

The *Dancy* court summarized the scope of this discretion in the Recorder:

> He has the right to exercise discretion in the premises, but not judicial discretion. The courts will sustain him when he acts within the limits of the discretion reposed in him; *they will coerce his action when he has exceeded those limits* and denied a right to which parties are by law entitled. Whether his action in the present case falls within or without the scope of the authority vested in him remains to be determined according to well-established principles of law.[20]

The emphasized portion of the quotation is what has special meaning for us here, and presents another way of viewing the action of the Recorder in the case at bar. The effect of the passage of 42 U.S.C. § 3604(c) was to limit this discretion with regard to restrictive covenants. Before the passage of Title VIII, there was no prohibition against publishing any "notices" or "statements" containing racially restrictive covenants, even though these were invalid, at least after Shelley v. Kraemer. The meaning of the discretion that the *Dancy* court explained was that the Recorder might record such invalid deeds (or covenants), even though he also had the discretion to refuse to record them. This would have been the case with racially restrictive covenants, just as it would have been with devises that violated the rule against perpetuities, both might be invalid, but the Recorder might accept either of them for recordation.

This changed with the passage of Title VIII, since it then became illegal for *anyone* to publish such a covenant, and this, as explained, *supra,* included the Recorder of Deeds. Since the Recorder, like any other ministerial officer, has no discretion to perform illegal acts, his discretion has been limited by Title VIII. While the *existence of his discretion does not compel* him to be alert to such invalidities as violations of the rule against perpetuities, the *positive prohibition of 42 U.S.C. § 3604(c) imposes a duty* on the Recorder to be alert for racially restrictive covenants, and to refuse to record them.[21]

### B. *The legislative history.*

The legislative history, although extensive and voluminous, sheds little more definite light on the specific problem confronting us here. Nowhere in the legislative history is there mention of the Recorder of Deeds, nor any specific mention of the applicability of the act to any similar state official who performs what

19. 24 App.D.C., at 499.

20. *Id.* (emphasis supplied).

21. This discussion points up one difference between the Police Regulation, Article 45, § 3(b), and Title VIII. The Police Regulation, by its terms, is directed *only toward the maker* of the deed or the transfer of an interest in real property, while Title VIII prohibits the proscribed publishing by *anyone.* Thus it can be argued that the Police Regulation has no effect upon the discretion of the Recorder, who might still be allowed to record a deed with a condition proscribed by Article 45, § 3(b). After Title VIII, of course, the discretion of the Recorder would be limited to exclude such recordation. On the other hand, because of the wording of 45 D.C.Code § 503, it may still be maintained that by virtue of Article 45, § 3(b), the Recorder is barred from recording a deed which violates the Police Regulation. See *supra,* I.C.

the panel opinion has been careful to describe as "ministerial" functions.[22] However, the purpose behind the Fair Housing Act of 1968 was very clearly manifested, and that purpose, in all fair judgment, is broad enough to include such activity of the District of Columbia Recorder of Deeds.

Congress was aware that the measure would have a very broad reach, and indeed the legislation was seen as an attempt to alter the whole character of the housing market. "The fact is that the discrimination is not solely and plainly the act of a private person dealing with his own property. Discrimination is based in such matters on problems of whole community prejudices operating against the will even of the individual property owner and of the individual real estate broker who would not, within himself, want to perpetuate this kind of housing noose, who feels either a sense of social or business responsibility to do something about this issue, but who feels coerced and intimidated by the climate of the opinion in which he lives. That is the reason for putting into legislative terms a national policy designed to end discrimination in housing." [23]

It is undeniable that the fair housing provisions were aimed primarily toward actual sales and rentals of real estate, yet it is rather inconsistent to maintain that such a statute, with the broadest objectives and scope, is to apply to private persons in the commercial market in their publication of notices of sale of real estate, and not to apply to an official whose office exists for the primary purpose of publishing notices of the sale of real estate to interested third parties and to the public in general.[24]

Of course it is true that, as one witness at the hearings stated, the statute "outlaws advertising that is racial in nature," but the statute does much more.[25] That the reach of the statute

22. This is more understandable when one realizes that the fair housing provisions were finally added to the Civil Rights Bill on the floor of the Senate. These provisions originally appeared in a different bill which never was voted out of the Senate committee which considered it. While there is one House Report which deals with the legislation, it is nothing more than a recommendation that the bill pass, and as the fair housing provisions were never actually voted out of a Senate committee, there is no helpful Senate Report either. Our research has indicated that the only helpful legislative history is the Senate hearings which are here referred to.

23. Testimony of Marvin Braiterman, Counsel to the Commission on Social Action of Reform Judaism, representing the Commission on Religion and Race, Synagogue Council of America, testifying before the Senate Subcommittee on Constitutional Rights of the Committee on the Judiciary which was considering S.1026, the Senate bill from which were taken the fair housing provisions which were ultimately enacted. Hearings Before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, United States Senate, on S.1026, S.1318, S.1359, S.1362, S.1462, H.R.2516 and H.R.10805 (Proposed Civil Rights Act of 1967) (August and September 1967) (Hereafter "1967 Hearings"), at 128.

24. Compare Judge Wright's opinion, pp. 634-635.

25. That statement was made by William L. Taylor, Staff Director, U.S.Commission on Civil Rights, in the course of the 1967 Hearings, supra, note 17, during an exchange with Senator Ervin with regard to the meaning of the words "oral or written" (which words were later dropped), which preceded the words "notice, statement, or advertisement" in that section of the bill which ultimately became 42 U.S.C. § 3604(c). The dialogue itself shows the statute as construed by Senator Ervin, and was as follows:

Senator Ervin: I invite your attention to . . . subsection (c) of section 404. . . . Doesn't that make it unlawful for a man to prefer to sell a house to a man of his own race, religion, or national origin than to others?

Mr. Taylor: I think it outlaws advertising that is racial in nature.

Senator Ervin: Look at those "or's." They are not "and's," they are "or's." As we lawyers say, they are in the disjunctive. Now leave out the ones that are immaterial. It makes it unlawful to make any oral statement with respect to the sale or rental of a dwelling that indicates any preference based on

was intended to be very broad is demonstrated by a statement made by Secretary of Housing Weaver:

> This is a comprehensive proposal which would prohibit discrimination in the sale, rental, or financing of housing, including discriminatory advertising and *discrimination in representations made as to the availability of housing.*[26]

The phrase emphasized, "representations made as to the availability of housing," might be particularly applicable to a restrictive covenant in a deed, as the title examiner who looks at a deed to determine, in a sense, whether the property is "available" will be examining such a covenant. The title examiner furnishes his findings to the prospective purchaser or his lawyer, who makes his evaluation of the availability of the housing.

It does not matter whether the intent to discriminate is ultimately successful (the lawyer examining title will know the restrictive covenant is a nullity), but simply that the intent to discriminate is expressed. It is the latter activity that is forbidden, and even if the intent to discriminate is a legal nullity, it has a discouraging psychological effect on purchasers, and thus narrows the housing market in a way that it certainly was the objective of the Fair Housing Act to eliminate.[27] Virtually no real estate transaction takes place without someone, usually a title examiner working for the purchaser, paying a visit to the Recorder of Deeds to check the title. What he finds there will affect the transaction, because what is there has been put under the District of Columbia statutes to serve as notice. It is the total sense and purpose of the Fair Housing Act that no discrimination shall affect such real estate transactions; it thus follows that there shall be no discriminatory representations at the office of the Recorder of Deeds. "Neutral repository" or not, the office of the Recorder is a vital part of the real estate world, and, as such, the Recorder's office should be free from manifestations of

race, color, religion, or national origin or an intention to make any such preference. Doesn't that make it unlawful for a man to make any statement orally in respect to the sale or rental of property that he prefers to sell or rent property to a man of his race, religion, or national origin in preference to that of a man of another race or another religion or another national origin? [1967 Hearings, at 233.]

Later in this dialogue, Mr. Taylor made the statements about the proposed act that "I would say that a man cannot print a statement saying 'I prefer to sell my house to a white man,'" and "I think that [the section] is intended to refer to public statements," showing that Mr. Taylor understood the proposed act to do more than simply prohibit advertising that "is racial in nature."

26. 1967 Hearings, *supra*, note 23, at 482 (emphasis supplied).

27. *See, e. g.,* the Statement of Secretary Weaver recorded in the 1967 Hearings, at 487:

> I believe that the [fair housing provisions] should be enacted because the time has come when the Federal Government must establish a national policy against discrimination in housing as it has in other vital areas of American life. It should be enacted so that more than 20 million American Negroes and other minorities will attain the freedom to choose the homes in which they wish to live on the basis of what they can afford—just as other Americans do.
>
> The rebuilding of our cities . . . cannot be successful unless we eliminate all forms of discrimination including discrimination in housing. Our non-white citizens must be free to find their homes both in our central cities and our suburbs if the enforced racial ghetto is to be eliminated. The rising crescendo of voices in these ghettos cries out for better housing. And the conscience of America cannot be at ease as long as a sector of its citizens continues to be denied equality of opportunity in shelter. These voices must be heard if we are to solve the most important domestic problem facing America today. No valid reason can be advanced why ten percent of our fellow Americans should be deprived of freedom of choice in selecting the most essential commodity, a home in which to live and to bring up their children.

discrimination such as racially restrictive covenants.

Our construction of Title VIII to prevent the recording of deeds with racially restrictive covenants is similar to the construction of Title II of the Omnibus Civil Rights Bill which the Supreme Court used in Daniel v. Paul,[28] where the Court said:

[I]t does not follow that the scope of § 201(b) (3) should be restricted to the primary objects of Congress' concern *when a natural reading of its language would call for broader coverage.* In light of the overriding purpose of Title II "to move the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public," [citation omitted] . . . the statutory language "place of entertainment" should be given full effect according to its generally accepted meaning and applied to recreational areas.[29]

Just as the Court in *Daniel* read Title II broadly to effectuate the congressional purpose, we think that Title VIII should be read broadly to effect the congressional purpose in eliminating racially restrictive covenants from the housing market, and thus the Recorder's activity in publishing deeds comes within the prohibition of Title VIII.

As Congress has so clearly manifested its intent in Title VIII, we think that we may rest our decision on this statutory ground without any need to seek a constitutional basis. This is particularly appropriate where, as here, Congress has exercised its constitutional role of "fleshing out" the Thirteenth and Fourteenth Amendments by the passage of appropriate legislation.[30]

## C. *Harm to the appellants.*

The question of whether the appellants in this case have shown the requisite harm *to them* to support an action must also be evaluated with reference to the broad congressional policy in passing the fair housing provisions, a "national policy of open housing that [would] greatly facilitate movement of people free from the artificial barriers of racial restrictions."[31] Given this broad congressional policy, this situation is not unlike that in Barrows v. Jackson,[32] where the Court held that a homeowner *could assert the rights of third persons* injured by a racially restrictive covenant which burdened the homeowner's land. As in *Barrows*, this is an occasion when the reasons underlying the normal rule denying standing to raise another's rights "are outweighed by the need to protect the fundamental rights" of those whom Congress has sought to protect by the fair housing provisions.[33]

Even aside from their ability to assert harm to third persons, however, there is here present actual harm to the appellants themselves, which they may assert. While it is true that racially restrictive covenants cannot be enforced, and thus might be thought to be harmless, it is nevertheless true that it is the premise of the legislation under which relief is here sought that a mere "notice, statement, or advertisement" indicating a racial preference, such as we have in the case at bar, is *ipso facto* harmful. Since the purpose of the legislation is to prevent discrimination in housing, it must have been assumed by Congress that any such "notice, statement, or advertisement," merely by its publication, might have the effect of preventing some persons from

28. 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969).

29. 395 U.S., at 307–308, 89 S.Ct., at 1702 (emphasis supplied).

30. *See, e. g.*, Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), Katzenbach v. Morgan, 384 U.S. 641, 672, 86 S.Ct. 1731, 16 L.Ed.2d 828 (1966).

31. 1967 Hearings, at 479 (Statement of Senator Hart, one of the sponsors of the original bill).

32. 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

33. See 346 U.S., at 257, 73 S.Ct., at 1035.

buying or renting housing with regard to which any such discriminatory "notice" or "statement" had been made.

It necessarily follows that since the market for any such housing is limited by the exclusion of any persons who would be prevented from buying or renting by the mere publication of the discriminatory "notice, statement, or advertisement," homeowners such as appellants who own property in connection with which such a "notice, statement, or advertisement" has been published have been "harmed" by such a limitation in the marketability of their homes. This is true whether such reluctance to buy or rent stems from "a misapprehension as to the legal effect" of the discriminatory language or simply a desire on the part of such persons not to buy or rent where they appear to be unwanted.[34]

Looking at the matter from a different point of view, a landowner whose deed does not have a restrictive clause has reason to object to the appearance of such clauses in other deeds. There may well be prospective buyers who would be uninfluenced by racial considerations in deciding where to buy if left to themselves, without any official or published input along those lines, but who may be influenced or induced to give a marginal preference to a home that has such a deed. So far as the effective market is concerned, it is enough if such a buyer gives a preference in only the limited sense of letting those restrictive deeds define the area where he first begins to look at houses.

If the above analysis of the District of Columbia statutes, the Recorder's

present office practice under those statutes, and the Fair Housing Act of 1968 is valid, by the accepted standards of judicial decision-making it is unnecessary to examine appellants' constitutional arguments which form so large a part of Judge Wright's rationale, and the reversal of the judgment of the District Court may rest on the statutory grounds.[35]

**TAMM, Circuit Judge, dissenting:**

I respectfully dissent for the reasons set forth in my opinion for the division of this court, attached hereto as an appendix.

**APPENDIX**

TAMM, Circuit Judge:

Appellants, homeowners in the District of Columbia whose deeds contain racially restrictive covenants, brought a class action suit in the District Court against the Recorder of Deeds and the Commissioner of the District of Columbia[1] on their own behalf and on behalf of all District of Columbia homeowners similarly situated. They alleged that the Recorder's actions in accepting for filing, and maintaining public records of restrictive covenants was in violation of the Fifth Amendment and Title VIII of the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq.

They sought the following relief: (1) a declaration that their rights were infringed by the practice of the Recorder of Deeds in accepting for recording and filing public records containing racially restrictive covenants; (2) an injunction

34. See Judge Wright's opinion, pp. 640–641.

35. A particularly puzzling aspect of this case is that the appellants did not seek relief from the Commissioners or the Mayor of the District of Columbia before coming into the District Court. D.C. Code § 45–701 provides in pertinent part that "The performance, by the Recorder of Deeds and officers and employees in his office, of their duties and functions shall be subject to the supervision and control of the Commissioners of the District."

This makes it clear that the Commissioners would have had the power to grant the relief which appellants seek here. As neither party raised the issue of failure to seek a remedy from the Commissioners before coming into court, however, and the case has been argued before both a regular panel and the court *en banc*, we are reluctant to allow this question to affect our disposition of the case.

1. The Commissioner is empowered to appoint, supervise, and control the Recorder. D.C.Code § 45–701(a), (c) (1967).

barring the Recorder from accepting for recording and filing any deed or instrument containing a racially restrictive covenant and from providing copies of such deeds or instruments without clearly identifying them as containing void and unenforceable racially restrictive covenants; and (3) an injunction requiring the Recorder to affix to every liber volume in his custody a notice that any racially restrictive covenants contained in the deeds or instruments therein were void and unenforceable.

In denying the requested relief, the District Court granted appellees' motion to dismiss, whereupon this appeal was noted. We affirm. First, we shall examine the nature of the office of the Recorder of Deeds and then proceed to a discussion of the statutory and constitutional issues.

## I.

Congress has provided that the Recorder of Deeds shall " . . . record all deeds, contracts, and other instruments in writing affecting the title or ownership of real estate or personal property which have been duly acknowledged and certified; " D.C.Code § 45–701 (1967). He is further required to "perform all requisite services connected with the duties prescribed" in regard to the filing of instruments and to "have charge and custody of all records, papers, and property appertaining to his office." D.C. Code § 45–701(a) (3), (4) (1967).

Interpreting the statute shortly after enactment this court stated:

> Undoubtedly, the recorder of deeds is in the category of ministerial officers, and has no jurisdiction to pass upon the validity of instruments of writing presented to him for record. It requires no elaboration of law or of the authorities to sustain this contention. Dancy v. Clark, 24 App.D.C. 487, 499 (1905).

We pointed out that although the Recorder does have ministerial discretion to determine whether a document is of the type appropriate for filing "[h]e is by the law required to receive and file

. . . such instruments as have been duly executed, and which purport on their face to be of the nature of the instruments entitled to be filed. . . ." *Id.* In short, the nature of the office bars the relief which appellants seek.

The Recorder of Deeds is a ministerial officer. The authority of a ministerial officer is to be strictly construed as including only such powers as are expressly conferred or necessarily implied. Youngblood v. United States, 141 F.2d 912 (6th Cir. 1944). A decision as to whether to file a deed containing a restrictive covenant involves discretion. Indeed, the Recorder is not even permitted to correct obvious typographical errors despite the consent of all the parties thereto.

Furthermore, the Recorder is not empowered by the statute to determine the legality, validity or enforceability of a document to be filed. Determining whether a covenant in a deed is a racially restrictive covenant demands a legal judgment. The clerical staff of the Recorder certainly does not have the knowledge, capacity or acumen to perform the tasks asked of them by appellants.

In many respects the Recorder's function is similar to that of the clerk of a court. The clerk of a court, like the Recorder is required to accept documents filed. It is not incumbent upon him to judicially determine the legal significance of the tendered documents. In re Halladjian, 174 F. 834 (C.C.Mass.1909); United States, to Use of Kinney v. Bell, 127 F. 1002 (C.C.E.D.Pa.1904); State ex rel. Kaufman v. Sutton, 231 So.2d 874 (Fla.App.1970); Malinou v. McElroy, 99 R.I. 277, 207 A.2d 44 (1965). In State ex rel. Wanamaker v. Miller, 164 Ohio St. 176, 177, 128 N.E.2d 110 (1955), the court commented upon the function of its clerk in the following manner:

> It is the duty of the clerk of this court, in the absence of instructions from the court to the contrary, to accept for filing any paper presented to him, provided such paper is not scurrilous or obscene, is properly prepared and is accompanied by the requisite filing fee.

The power to make any decision as to the propriety of any paper submitted or as to the right of a person to file such paper is vested in the court, not the clerk.

The Recorder is a neutral conservator of records. The entire purpose and value of his office is that he preserves the precise documents presented to him. To give the Recorder the power to do what appellants ask would not only be in violation of the statute creating his office, but would functionally distort the office into a hydra-headed monster.

Even though the acts of the Recorder are ministerial in nature, they may not violate with impunity the statutes of this land, nor may they contravene the constitution. We must therefore continue our inquiry. First, we turn to the relevant statute.

## II.

Title VIII of the Fair Housing Act of 1968, 42 U.S.C. § 3604(c) (1970), makes it unlawful

[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, *with respect to the sale or rental of a dwelling* that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin, or an intention to make any such preference, limitation, or discrimination. (Emphasis supplied.)

On its face the statute clearly does not apply to the Recorder of Deeds. The Recorder does not offer property for sale or rent, nor is he in any way connected with the commercial real estate market. He merely functions as a neutral repository. The "notice" or "statement" the statute speaks of is that made by the offeror or his agent in the market place.

The legislative history bears out this interpretation. After a careful search of the hearings, debates and testimony, we find only that the depth and dearth of legislative history stands in sharp contrast to the shallowness of appellants' position. The thrust of the statute is clearly directed towards advertising in the market place. As a principal witness at the hearings stated: "I think it outlaws advertising that is racial in nature."[2] Furthermore, while testifying on a substantially similar bill former Attorney General Katzenbach catalogued the parties and acts which the statute was intended to cover. The Recorder is nowhere mentioned. He stated:

The title applies to all housing and prohibits discrimination on account of race, color, religion, or national origin by property owners, tract developers, real estate brokers, lending institutions, and all others engaged in the sale, rental, or financing of housing.[3]

## III.

Although the Fair Housing Act of 1968 does not prohibit the Recorder's actions, those actions must be enjoined if they are violative of the due process clause of the Fifth Amendment. As the states are prohibited from racial discrimination by the Fourteenth Amendment, so the District of Columbia and its agents, including the Recorder of Deeds, are prohibited from discrimination on the grounds of race by the due process clause of the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

The Supreme Court has declared racially restrictive covenants void and unenforceable. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The question presented here is whether the Recorder of Deeds, by recording and filing deeds containing racially restrictive covenants, deprives appellants of constitutional due process.

---

2. Hearings on S.1026, S.1318, S.1362, S.1462, H.R.2516, H.R.10805 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 90th Cong., 1st Sess. 233 (1967).

3. Hearings on S.3296 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 89th Cong., 2nd Sess., pt. 1, at 84 (1966).

A prerequisite to recovery under the Fifth Amendment is a showing of (1) harm done appellants (2) by the Recorder. We find these essential elements lacking.

The Recorder of Deeds, impartial in thought as well as action, is not giving the approbation of the state to the substantive contents of the deeds filed. The Recorder, the cold steel safety deposit box of the real estate industry, merely preserves documents. Although he acts on behalf of the government, he acts as a studiously *neutral* repository.

The concept of neutrality plays an important role in constitutional law. Where the government is under no affirmative obligation to act and is merely neutral, there can be no due process violation.[4] In a related area of the law

courts have found insufficient state involvement in private discrimination to constitute a constitutional violation where the state merely played a neutral part.[5] We find these cases most instructive.

The most developed area of law for our purposes is the administration of estates and trusts.[6] If the state probates a discriminatory will through the use of its legal machinery—*i. e.*, Recorder of Wills and Probate Court—the courts have held that the government is merely acting in a nonsignificant neutral capacity which does not constitute state action under the Fourteenth or Fifth Amendments. *See* United States National Bank v. Snodgrass, 202 Or. 530, 275 P.2d 860 (en banc 1954) ; Gordon v. Gordon, 332 Mass. 197, 124 N.E.2d 228, cert. denied, 349 U.S.

4. Government inaction as well as action may result in a constitutional violation. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). However, the government must have a duty to act and the failure to so act must result in state supported or encouraged discrimination. The instant case is clearly inapposite.

5. State action appears to exist here. This is not a case where a plaintiff brings suit against a *private* individual and alleges state involvement in private discrimination. Here plaintiff is suing the *state* and asserting that the state is involved in discrimination. The case is certainly unusual in this sense. If, however, we were to ignore this factor and analyze the case in terms of whether there is state action which encourages private discrimination, we would find none, for the state action complained of is merely a neutral one.

It must be recalled that not all governmental action is state action within the purview of the Fifth Amendment. The action must "significantly" involve the state in private racial discrimination. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). This is a logical conclusion. Any other result would open unfathomable breaches, for surely it cannot be gainsaid today that the government is not to some extent involved in every facet of our lives.

In Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1966), the Court suggested three factors to con-

sider in determining whether state action is present. The first—immediate objective of the act—and the third—historical context and conditions existing prior to the act—are clearly inapposite. The sole purpose of the statute creating the office of the Recorder, and the actions of the Recorder, is to facilitate and insure the safe transfer of reality. The Recorder is a neutral repository. He is not an advocate. The second factor—ultimate effect of the act—likewise indicates no state action to discriminate. Contrary to appellants' allegations no substantial harm is caused by the actions of the Recorder. See discussion in text.

Clearly then, the relevant factors set forth in *Reitman* indicate no state action. Furthermore, the neutral aspect of the governmental action which we have discussed in the text precludes a finding of state action within the terms of the Fourteenth Amendment *See* Evans v. Abney, 396 U.S. 435, 444, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970) ; footnote 6, *infra.*

6. Neutral state involvement in many other forms of discrimination have been placed outside the scope of the constitutional guarantees. *See* Walz v. Tax Commission of the City of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (religious tax exemption) ; Black v. Cutter Laboratories, 351 U.S. 292, 76 S.Ct. 824, 100 L.Ed. 1188 (1956) (state court enforcement of contract clause) ; Williams v. Howard Johnson's Restaurant, 268 F.2d 845 (4th Cir. 1959) (licensing by the state).

947, 75 S.Ct. 875, 99 L.Ed. 1273 (1955). *See also* Wilcox v. Horan, 178 F.2d 162, 165 (10th Cir. 1949).

Speaking for the Court in Evans v. Newton, 382 U.S. 296, 300, 86 S.Ct. 486, 489, 15 L.Ed.2d 373 (1966), Justice Douglas stated:

> If a testator wanted to leave a school or center for the use of one race only and in no way implicated the State in the supervision, control, or management of that facility, we assume *arguendo* that no constitutional difficulty would be encountered.

If, however, in the administration of an estate or trust the government takes an active non-neutral role by supervising, managing or controlling, there is state action within the confines of the Fourteenth Amendment. *See* Pennsylvania v. Board of Directors of City Trusts, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed. 2d 792 (1957); Pennsylvania v. Brown, 392 F.2d 120 (3rd Cir. 1968), cert. denied, 391 U.S. 921, 88 S.Ct. 1811, 20 L. Ed.2d 657 (1968).

In Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970) the Supreme Court found no state action in the Georgia state court's application of the doctrine of *cy pres* to a racially discriminatory trust. The Court reasoned that the Georgia court was merely enforcing trust laws which were "long standing and *neutral* with regard to race." *Id.* at 444, 90 S.Ct. at 633. (Emphasis supplied.) The court reached this conclusion despite the fact that a state is involved in a racially discriminatory trust in the following ways: (1) the state attorney general enforces the trust on behalf of the public; (2) the courts supervise the administration of the probate estate and trust; (3) the trust enjoys tax exempt status; and (4) the doctrine of *cy pres* as well as other state statutes often apply to the trust.

In the instant case appellants urge that the mere neutral act of recording deeds constitutes state action in violation of the Fifth Amendment. In light of the above precedents, we cannot agree. In the final analysis, the evil of which appellants complain lies not in the office of the Recorder, but in the soul of man.

Appellants have also failed to demonstrate any harm resulting from the recordation of racially restrictive covenants. These covenants are clearly unenforceable and may be easily repudiated.[7] In addition, these covenants do not constitute a cloud on title or affect the marketability of the property. As the learned District Judge stated:

> It is stretching too far to say that the presence of the offensive language in a deed in the custody of the Recorder is going to frighten a would-be buyer. We must face the practicality that buyers do not begin their negotiations by examining the records maintained by the Recorder of Deeds. That function is performed by brokers, attorneys and title insurance companies making the record searches. Brokers, lawyers and title insurance companies are fully aware that racially restrictive covenants are not enforceable. 330 F.Supp. at 448.

Appellants, nevertheless, rely upon Bryant v. State Board of Assessment of State of North Carolina, 293 F.Supp. 1379 (E.D.N.C.1968) and Hamm v. Virginia State Board of Elections, 230 F. Supp. 156 (E.D.Va.1964), aff'd per curiam sub nom. Tancil v. Woolls, 379 U.S. 19, 85 S.Ct. 157, 13 L.Ed.2d 91 (1964), for the proposition that where records are maintained with unconstitutional racial identifications the maintenance is unconstitutional per se requiring no demonstration of harm. Appellants have misread these cases. In these cases state officials listed Negro and white citizens separately on voting, property assessment and divorce records. In voiding these laws, the *Bryant* court found that citizens were harmed because the opportunity for discrimination in jury selection was present. No such potential exists here. Furthermore, there is

---

7. The homeowner need only file a corrective deed with the Recorder and pay a nominal fee.

no list maintained here which classifies individuals by race, for restrictive covenants appear on deeds owned by persons of all races. Moreover, in each of those instances the lists were compiled and maintained by affirmative action of the state. A situation we again do not have here.

### IV.

We reach our decision somewhat reluctantly. Not reluctant in the law we expound, for we know it to be right; but, reluctant in the conclusion some may draw, and the interpretation others may glean, from our decision. We firmly believe the *legal* result in this case to be correct. We are convinced that the ministerial nature of the office of Recorder of Deeds bars the remedy sought. We also can find no statutory or constitutional violation in the actions of the Recorder of Deeds. This, however, is not to say there is no remedy for an unfortunate situation. It merely means the remedy sought is beyond the ken of the judiciary.

Congress has a panoply of power as well as a plethora of resources at its disposal to create the legal machinery to deal with this problem. We note that the courts have given an expansive reading to Congressional power in the eradication of discrimination from the fibre of our society. *See* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). We urge the Congress to gather together representatives from among the bankers, brokers, title insurance companies and land developers for a serious attempt at a solution. Restrictive covenants, born of a racist milieu, exorcised by the white-sheeted ghosts of a not too distant past, do not find favor with this court. We exhort the Congress to extricate the nation from this quagmire of inequality by excising these atavistic anachronisms from the legends of our culture.

### V.

The vigor of our dissenting brother requires us, reluctantly, to point out, respectfully, his unfortunate failure to distinguish between the facts in this record and the fluency of his self-created rhetoric upon which he bases his erroneous conclusion. By frequently incanting "restrictive racial covenants", "constitutional" and "individual rights", as if the mere utterance of these words had some secret power to dictate an only conclusion, the dissent is obviously and completely hubristic of the factual situation to which the record confines us. There is no evidence of "governmental participation in . . . an illegal endeavor— . . . ., maintenance of a segregated housing market" or of Government becoming a "co-conspirator in an illegal scheme." The Recorder, as we point out, is neither "publishing nor circulating" racial covenants. The Recorder has not made a "policy decision to consider illegal, racist covenants as documents affecting the title or ownership of real estate," nor is he giving "deliberate and manifest encouragement of private discrimination." The Recorder does not put "Government's seal of approval" on the documents he files any more than the clerk of this court puts judicial approval on the documents he accepts for filing. Obviously the filing of documents with the Recorder does not in any manner, means or way establish their legitimacy. These strained contortions of the meaning and nature of the record in this case, illustrate again the unfortunate practice of some members of this court of attempting to wrench far-reaching social changes without regard to the facts, the law or precedents in a particular case, and in absolute disregard of the principle of separation of powers. The practice of choosing the philosophically eclectic rather than the established legal precedents is unfortunately a pursuit of abstract liberalism for its own sake rather than an adjudication of the law governing an individual case. The dangerous illusion that the courts, upon the pretext of ruling upon a particular case may

articulate with great sympathy and understanding upon all of the social evils of the nation, is implausibly fashionable in some areas of judicial rulings, with a resulting horrible economy of law. Somehow, these judicial proclamations, be they in medicine, economics, ecology, political science, religion, domestic relations or crime, are presumably made more acceptable by using such euphemisms as "civil rights", "constitutional rights", "discrimination" and "public interest", regardless of the fact that the record before the court is devoid of factual data supporting the resulting judicial legislation. That we thereby evade the legal truth in a particular situation is self-justified, apparently in the view that we have homogenized the life-blood of society. Without praying for, or dreaming of a consensus on every issue, we regret the suggested disposition of this, or any case for that matter, on a philosophical rather than a legal basis.

MacKINNON, Circuit Judge, dissenting:

I concur generally in Judge Tamm's opinion. It is my view of the statute, which provides that the "Recorder of Deeds . . . *shall* . . . (1) record *all* deeds, contracts, and other instruments in writing affecting the title or ownership of real estate or personal property which have been *duly acknowledged* and certified" (D.C.Code § 45–701 (1967 ed.) (emphasis added)), that it is essentially an ordinary *recording statute* which, by use of the word "shall," requires the administrator of the office ministerially to accept for record documents which are "duly acknowledged and certified," generally without further inquiry.

This interpretation is not changed by D.C.Code § 45–503 which provides:

The recorder shall not accept for record or record any instrument which shall not be *executed and acknowledg-*

*ed agreeably to law by the person or party* therein granting or contracting with respect to his right, title, or interest in the land therein described. [Emphasis added.]

This obviously only requires that the *physical act of executing* (signing) the documents, and having them acknowledged, be agreeable to the law. To read more into it, particularly in view of the provisions of § 45–701, is not justified.

It is my opinion that the deeds in question do conflict with the Fair Housing Act, 42 U.S.C. § 3604(c), but as set forth above it is not the duty of the Recorder to pass on the legality of documents submitted for recording, other than with respect to the form of their execution and acknowledgment. It is obviously an improper extension of the language of the Recording Act to place this additional burden upon the Recorder; his office has never fulfilled that function and it is not equipped to do so. Also, while the task may be easy with respect to some deeds it can be very difficult with respect to others where the intent and purpose is obscure and borderline. It would also apply to other restrictive covenants of a zoning nature. I would thus not attempt to make the Recording Act fulfill such unrelated and obviously unintended purposes. To my mind, Congress in enacting the Recording Act, the same as state legislatures generally throughout the country, merely intended to provide a public *record* of real estate documents and it will be a mistake to extend its functions substantially beyond this purpose.

The majority opinion bases its conclusion on the repeated assertion that it is illegal to *file* the documents; but that is not proved—it is merely asserted. At this time, when the record reflects that most deeds do not contain illegal restrictive covenants, I see no necessity to indulge in what is essentially judicial legislation.